## PRIDDY v. GREEN et al. (No. 1623.)

(Court of Civil Appeals of Texas. Amarillo. March 10, 1920. On Motion for Rehearing, April 7, 1920.)

**1. Mines and minerals ⬉⇒56—Oil lease is more than "license."**

An oil lease, giving lessee the right to enter and drill for oil, lay pipes, and erect structures, etc., on the land for five years, and so much longer as oil was produced thereon, is more than a mere license, which is a personal privilege to do some act on the land, without passing any estate therein, and which is revoked by a conveyance by either lessor or lessee.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, License.]

**2. Frauds, statute of ⬉⇒63(2)—Oil lease conveys "estate" of "inheritance"; "demise."**

Oil lease for five years and longer, giving the lessee, his heirs, and assigns right to sink wells, lay pipes, erect tanks, etc., conveys an estate of inheritance within statutes of frauds (Rev. St. 1911, art. 1103), "estate," in the statute, meaning any quality of interest from that of absolute owner to naked possession, and "inheritance" meaning the method by which children or relatives take property from another at his death; and this is so, whether the lease is termed a conveyance, grant, or lease, or a "demise," which signifies a conveyance either in fee for life or for years.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Demise; Estate; Inheritance.]

**3. Frauds, statute of ⬉⇒44(4), 63(2) — Contract or transfer of oil lease must be in writing.**

A lease giving right to enter and remove oil and gas, whether considered a contract to lease for a term more than one year, or a contract conveying an interest in the land must be in writing.

**4. Mines and minerals ⬉⇒58 — Lessee's covenants are sufficient consideration to support oil lease.**

The agreement by an oil lessee to explore for oil or to pay the agreed rental is sufficient consideration for the lease, so as to render the lease enforceable against the lessor.

**5. Mines and minerals ⬉⇒58—Oil lease is conveyance on condition subsequent.**

Oil lease granting rights to lessee, requiring him within a fixed time to begin operations or to pay the rentals, grants an estate on condition subsequent and is valid.

**6. Frauds, statute of ⬉⇒56(6)—Oil lease within statute must be in writing; "contract for the sale of land."**

A contract to assign interest vested by an oil lease for a term of more than one year must be in writing, under Rev. St. 1911, art. 3965; the words "contract for the sale of land," in the statute, including every agreement by which one promises to alienate an existing interest in land upon a consideration.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Agreement for Sale of Real Estate.]

**7. Principal and agent ⬉⇒132(1) — Contract with agent of disclosed principal does not bind principal.**

Where the principal is disclosed, but the contract is made in the name of the agent, and purports only to bind him, principal is not bound thereby, though the contract is for his benefit.

**8. Estoppel ⬉⇒78(3)—Equitable owner of lease cannot attack transfer of lease, whose acceptance he induced.**

An equitable owner of oil lease under contract to purchase it, who orally agreed to sell the lease, and induced the purchaser to take written contract from legal owner of the lease, is estopped to attack the contract with the purchaser, either under the statute of frauds, or as made only with an agent when the principal was disclosed.

**9. Equity ⬉⇒54—Party applying for equitable relief subjects himself to rules of equity.**

One who applies to the equity powers of the court for relief cannot complain that the rules of equity are applied against him in determining the rights of the parties, instead of enforcing the strict rules of law.

**10. Estoppel ⬉⇒78(3)—Giving of check which was certified held sufficient injury to establish.**

Where the purchaser of an oil lease under oral contract from an equitable owner acquired the lease by direct conveyance from the legal holder at his vendor's suggestion, the giving by him of a check for part of the purchase price, which was certified by his bank, and thereby the amount was withdrawn from his account, was sufficient injury to support estoppel against the vendor to attack his title.

**11. Estoppel ⬉⇒78(3)—Want of authority for conveyance defendant was induced to accept held not to affect plaintiff's estoppel.**

Where the equitable owner of an oil lease under contract from a corporation sold his interest to a purchaser, whom he induced to accept a conveyance from the corporation executed by its president, and thereafter secured a conveyance to himself from the corporation, executed by the vice president and secretary, the lack of the president's authority to execute the conveyance to the purchaser does not defeat purchaser's right to the lease by estoppel of the equitable owner.

### On Motion for Rehearing.

**12. Principal and agent ⬉⇒156 — Immaterial whether representations were made by principal or agent.**

It is immaterial whether the representations which are the basis of estoppel against a vendor by oral contract were made by the vendor himself or by his agent, who consummated the transaction.

⬉⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**13. Estoppel ⊚⇒78(3)—Relationship between parties acting together does not affect estoppel of one to attack result.**

Where the legal holder of an oil lease, the equitable owner thereof under contract to purchase, and one who had introduced a subsequent purchaser, all acted together in completing the sale to subsequent purchaser, it is immaterial to the issue of the equitable owner's estoppel to attack sale what were the exact relations between the three persons so co-operating.

**14. Escrows ⊚⇒9—Title does not vest until performance of condition.**

Where a contract for the transfer of an oil lease was deposited in escrow until the payment of the balance of the purchase price after examination of the title, no estate or interest vests in the purchaser until the performance of the condition.

**15. Escrows ⊚⇒8(2)—Estoppel ⊚⇒78(3)—Escrow owner who directs delivery to another is estopped to attack title.**

Where the legal owner of an oil lease has deposited in escrow a contract to transfer it, he holds the title as trustee for the purchaser, and a direction by the purchaser to convey to another is a waiver of right under the escrow, which estops the purchaser from attacking title conveyed.

**16. Principal and agent ⊚⇒156—Representation by agent that principal had abandoned rights under escrow held to estop principal.**

Representations by the legal owner of an oil lease, who had been made the agent of the purchaser under a contract in escrow to sell to another, to the second purchaser, that the former had abandoned his rights under the escrow agreement, estopped the principal, though the second purchaser could by inquiry have ascertained his falsity.

**17. Frauds, statute of ⊚⇒139(1)—Not applicable to executed oral contract.**

Contracts within the statute of frauds are not void or illegal, but their enforcement only is suspended until the provisions of the statute are satisfied, so that it does not apply to an oral contract which has been executed.

**18. Frauds, statute of ⊚⇒102—Purchaser under oral contract can rely on written contract executed at vendor's request.**

Where the vendor of an oil lease attacked the claim of his purchaser because the contract between them was not in writing, the purchaser could rely on a written contract given him by the holder of the legal title at request of the vendor, who had merely a contract to purchase from the holder.

**19. Mines and minerals ⊚⇒81—Holder can defend legal title by showing equitable claim is without equity.**

The holder of a legal title to an oil lease can defend his title against an equitable claim under a prior contract for sale by showing that the holder of the equitable claim is without equity.

**20. Estoppel ⊚⇒102—Attempt to rescind after estoppel held not to defeat contract.**

One who had made an oral contract for the sale of an oil lease under circumstances which estopped him from attacking the purchaser's title, because of payment of part of the price and acceptance of the obligation to pay the balance, cannot, after the lease has become valuable, rescind his contract to the prejudice of the purchaser.

**21. Banks and banking ⊚⇒145 — Writing "good" on check by cashier is certification.**

A check may be certified by a bank by cashier writing thereon the word "Good" and signing his name.

Appeal from District Court, Wichita County; Edgar Scurry, Judge.

Action by Clois L. Green and others against W. M. Priddy, to recover an oil lease, in which Roberts and another intervene. Judgment for plaintiffs and intervener on directed verdict, and defendant appeals. Reversed and remanded, and motion for rehearing overruled.

Martin & O'Neal and Bullington, Boone, Humphrey & Hoffman, all of Wichita Falls, and I. W. Stephens, of Ft. Worth, for appellant.

Weeks, Morrow, Weeks & Francis, of Wichita Falls, for appellees.

HUFF, C. J. Clois L. Green, F. P. Lesh, and some eight others brought suit against W. M. Priddy, claiming to own, as assignees of an oil lease, 10 acres of land, setting out the facts of their claim, and alleging a wrongful entry thereon by Priddy, and that he was threatening to put down a well, and was proceeding to do so, and praying for temporary injunction against him, and to make it perpetual. It is also shown by the pleadings that 10 acres out of the appellees' holdings under a certain contract were conveyed to Roberts and Hill. Roberts and Hill intervened, and set up their right to the 10 acres, alleging they were innocent purchasers for value. Priddy answered, setting up that he had entered into a contract of purchase with F. P. Lesh, alleging the facts giving him a right to the 20 acres of land involved in the original petition and the plea of intervention, and also pleading estoppel, which will be shown by the facts as stated in the opinion. The case was tried before a jury, but after the introduction of the evidence the court instructed a verdict for the appellees and the intervener, and Priddy appeals.

On the 19th day of March, 1917, R. M. Waggoner and his wife, Ada Waggoner, entered into what is termed a lease contract with A. R. Calloway, the terms of which will hereafter be more particularly noticed. There is an agreement in the record that the Godley Oil & Gas Company, a corporation,

⊚⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

with its principal office at Henrietta, Tex., was the owner of a good and merchantable title to the oil and gas lease given by Waggoner and wife to A. R. Calloway on the 19th day of March, 1917, in so far as the lease pertains to and covered the 20 acres of land involved in this suit, which 20 acres is the east half of the southwest quarter of block 87, Red River Valley land subdivision, Wichita county, Tex., which block comprises 160 acres of land, the southwest quarter thereof comprising 40 acres, and the east half of same, involved in this suit, comprising 20 acres, and was the said owner on the date that the Godley Oil & Gas Company, acting through its president, W. M. Moore, entered into a contract for the sale of that lease to F. P. Lesh, one of the plaintiffs in this suit. The date of this contract was the 12th day of April, 1919, and it is agreed that on.that date the Godley Oil & Gas Company had good title to this lease. On the 12th day of April, 1919, the Godley Oil & Gas Company, acting through its president, W. M. Moore, entered into a contract with F. P. Lesh, contracting to convey a certain oil and gas leasehold estate executed by Waggoner and his wife in so far as it covers the 20-acre block in question. The consideration to be paid for the lease was the sum of $40,000. The corporation agreed within 30 days from date to furnish an abstract of title to the land, and the second party was to have 10 days after such abstract was furnished to.examine the same, and if the title was approved as good and merchantable the trade should be fully consummated. It was further agreed that the contract, together with the sum of $20,000 paid by Lesh, should be deposited in the First National Bank of Wichita Falls, Tex., upon the following understanding: That if the company should fully comply with its part of the contract, by furnishing the abstract above mentioned, and Lesh should fail or refuse to carry out his part of the contract, then in such event the said sum shall be forfeited to the company, as and for liquidated damages, and not as penalties or otherwise; but upon consummation of the sale the company agreed to execute and deliver to said bank for Lesh a good and valid assignment and conveyance to said oil and gas lease, and he should thereupon pay over to the said bank the remainder of said consideration, to wit, $20,000, which sum, together with the $20.000 deposited with the contract, should be paid over to the company. As this is an instructed verdict, the facts stated by us will be from the appellant's standpoint, or that part of the evidence most favorable to him.

About 9 o'clock a. m., April 17, 1919, F. P. Lesh offered to sell to W. M. Priddy the lease covering the 20 acres in question, stating that he was the owner, although at that time the sale to him had not been consummated, and that he had not paid for the lease, and no assignment to him of the lease had been executed. That Priddy believed he was the owner of the lease, and that Priddy then offered Lesh $50,000 for the lease, which was accepted by Lesh, $20,000. to be paid in cash, $20,000 in 10 days, and $10,000 in 20 days; Lesh promising to go at once and have the papers prepared in accordance with the contract. That he went immediately to the office of W. M. Moore, president of the Godley Oil & Gas Company, and instructed Moore to prepare the necessary papers to consummate the sale, which ·he had made with Priddy, suggesting that Priddy be substituted for himself in the contract then pending with the Godley Oil & Gas Company, which, after some preliminary discussions and objections on the part of Moore, was finally agreed to. Moore then prepared a contract, similar to the one which the company, through Moore, had previously entered into with Lesh, signing it as president of the company, and carried it to the office of W. M. Priddy, where it was executed by him, and Priddy delivered to Moore his check for $20,000, which was certified by the cashier of the bank shortly thereafter. Moore was in Priddy's office with the contract some time about 11 o'clock in the morning of the 17th of April. In the evening of that day W. H. Roberts, of the firm of Roberts & Hill, entered into an agreement with R. M. Waggoner, one of the joint owners of the land in question, for the purchase of the south 10 acres of the 20 acres in question for a consideration of $60,000, of which $10,000 was covered by a check then delivered to Waggoner, $20,000 to be paid in 5 days, and $30,000 to be paid in 30 days. On the following day this contract was reduced to writing and executed by R. P. Lesh, as seller, to Roberts & Hill, purchasers. It·appears that both the instrument and acknowledgment were dated back to the 17th day of the month. There is evidence in the record tending to show that Roberts, when he purchased, had notice of Priddy's claim. During the evening of the 17th Lesh informed Moore that he would not consummate the sale with Priddy, and at his request next morning Moore went to see Priddy, and tendered back the certified check which he had received from Priddy in the forenoon of the 17th, but Priddy declined to receive it.

Priddy testified, and alleged substantially, that on the morning of the 17th of April, 1919, Lesh represented to Priddy that he was the sole owner and holder of the oil and gas lease on the 20 acres under a contract with the Godley Oil & Gas Company, to whom it had been assigned by the original lessee, and on this representation Lesh sold the land to Priddy for $50,000, as above stated, and Lesh agreed with Priddy that he would, that morning, have the contract made and delivered to Priddy as soon thereafter as it could be prepared; that within a few minutes Lesh went to W. M. Moore, president of the Godley Oil & Gas Company, and instructed and empowered

Moore to substitute, for Lesh, Priddy, in the contract between Godley Oil & Gas Company and Lesh, and empowered and authorized Moore and the Godley Oil & Gas Company, as Lesh's agent, to execute and deliver the contract and assignment from the company, of which Moore was president. After detailing the facts leading up to the contract, Priddy testified:

"I said, 'Mr. Lesh, are you authorized to sell this lease?' He said, 'Yes; I own it myself.' He asked me what I would give him for the whole 20 acres. I told him; if he would make the terms so I could meet them, I would give him $50,000 for a lease on his entire 20 acres. He figured a little and said, 'You have bought it.' I said, 'All right; now let's see about the terms;' and we discussed it, and I asked him to let me have it on a basis of one-third cash, one-third in 15 days, and one-third in 30 days. He didn't care for that. I made another offer, which I think was the basis, of $10,000 cash, $20,000 in 10 days, and $20,000 in 20 days. He said he would let me have it on the basis of $20,000 cash, $20,000 in 10 days, and $10,000 in 20 days. I said, 'All right, I am going to take it.' I said, 'Now, we have made a clean, clear, unconditional trade, whether we get a dry hole out there; if we have got a dry hole, it is mine, and my loss, and my lease, and if it is an oil well it is mine.' He said, 'It is yours, all right.' And we got up and started over then to see about making out a check and have the contract drawn up. I said, 'Now, Mr. Lesh, how much money do you want me to pay you now?' I asked him in the meantime about the abstract, and he said he would furnish an abstract showing good title, and would allow me 3 days to examine it, and I was to allow Mr. Lesh, in case there was any defect, 10 days in which to cure the defect. I said, 'How much money do you want me to give you now, until you can get abstract and get your papers drawn up?' He said, 'I am going to do that immediately.' I said, 'But in the meantime will $5,000 be satisfactory?' And he said it would. I was going to give him $5,000 to keep or retain until he had his papers drawn up. I was going to give it to him as far as I was concerned. We would settle the difference between the $5,000 and $20,000 as soon as we got the papers drawn up. I said, 'Is $5,000 satisfactory?' and he said, 'Yes; but there is no use to write a check; I am going to have these papers drawn up immediately; I will go and do it right now.' He went out of the office with Mr. Armstrong. When the papers were drawn up, I was to pay $20,000 cash, and I would have given him the other $15,000. I didn't have any other conversation with him before he left the office. While Mr. Lesh was in my office, he didn't mention anything about Waggoner, or Green, or Parks, or Hapgood, or any associates. I asked him if he was authorized to sell the lease, and he said that he was; that he was the owner. He didn't mention any associates; he left the office with Armstrong, and said, 'I will have the papers drawn up immediately.' The agreement was that I was to buy the lease on 20 acres at the price of $50,000—$20,000 cash, $20,000 in 10 days, and $10,000 in 20 days."

The witness stated he next saw Judge Moore with reference to the contract. In about an hour and a half, or probably two hours, after Armstrong and Lesh were in his office, Judge Moore came to his office.

"I had not met Judge Moore before that time, and he came with Mr. Armstrong that morning about 11:30 o'clock. Judge Moore came in there, and Armstrong introduced him to me, and he told me that he was president of the Godley Oil & Gas Company, and that they had previously entered into an agreement of sale, or he may have used the word 'contracted' the sale of this particular lease, to Mr. Lesh, and that Mr. Lesh had been over to see him, and had told him that he had sold me this lease, and had requested and instructed him to transfer, to make the assignment, direct to me from the Godley Oil & Gas Company—to make the contract direct from the Godley Oil & Gas Company to me—and that he had come there to do this, and he had some papers in his hands. I said, 'Now, let's see, Judge, about that; if I understand this correctly, it is, instead of Mr. Lesh passing papers direct to me, he wanted the Godley Oil & Gas Company just to transfer it direct to me, to save it going through his name, and make a contract of sale and assignment direct to me, so that in the future my dealings will be with the Godley Oil & Gas Company, the grantee.' I said, 'Is this the contract?' He said, 'Yes.' I said, 'Have a seat a few minutes, and let my attorney look over it.' I took the contract, which is exhibited here in evidence. I am sure that I never met Judge Moore before. I don't know who had seen Judge Moore, and instructed him how to write this contract subsequent to the time that Mr. Lesh left my office and had agreed to sell me this lease, except that Judge Moore told me at the time that Lesh had—told me that Lesh had given him details of the contract as to payment and the time of payment, and had asked him as president of the Godley Oil & Gas Company direct to me in lieu of the one previously made to him, and to make the assignment direct to me, and to collect the $20,000 of the first payment, and I thought for a minute, and told him that I would do it. I relied upon the statement that Judge Moore had made to me that Lesh had instructed him to make the contract in this way."

The witness stated that Judge Moore signed the contract and that he signed it at that time; that he then gave a check for $20,000, payable to the order of the Godley Oil & Gas Company, and Moore took the check and the two copies of the contract and went out. Moore testified with reference to Lesh and Armstrong visiting him at the hotel on the morning of April 17th:

"They walked up and Lesh said, 'I sold it; I want you to write a contract for me.' He said to Armstrong, 'I don't want to get mixed up in any commission on this thing, as another man got the selling of this, and I want to go and see him.' I said, 'You don't want me to write up the contract for you until you see your man?' He said, 'Well, I know he has not sold the lease; but you go ahead and write this contract; make it direct from the Godley Oil

& Gas Company to Priddy. Let it take the place of the one you wrote me that is in the bank.' I asked him the party's name, and he gave me 'W. M. Priddy, Wichita Falls,' and this is the data that they gave me: 'W. M. Priddy, Wichita Falls, Texas; $20,000 cash, $20,000 in 10 days, and $10,000 in 20 days.' I didn't know Mr. Priddy at the time. I might have known that night who Armstrong was figuring with on the deal. Lesh said, 'I will just go ahead; I know this fellow has not sold this lease; go ahead and make this contract direct from the Godley Oil & Gas Company to Mr. Priddy.' Then he gave me the data. I said, 'Now, Lesh, I don't want to do that; you are selling this land for $10,000.' I noticed that he was only getting $50,000 for it. I was surprised when I saw he was taking that for it, because I would have bought it myself, if he had told me he would take that. I told him I could sell it for $60,000, and I thought he had sold it for $60,000 until he gave me this data. I said, 'I don't want to do this, Lesh; I don't want to make the contract out for this $50,000;' because that was in excess, and I said, 'That is in excess of what you are paying the Godley Oil & Gas Company for that land.' I said, 'It would not be right for them to pay an income on this additional amount, if you are going to do that.' The contract between the Godley Oil & Gas Company and Lesh was $10,000 less than the Priddy contract. We talked it over, and he said, 'Well, I will tell you what we can do. You can make the contract for the amount of $50,000; then write the transfer, and make the transfer for $10 and other valuable considerations.' He said to make the contract between the Godley Oil & Gas Company and Mr. Priddy, and then said make the transfer for $10 and other valuable considerations, and then, in making up the income tax, the Godley Oil & Gas Company can make up their income according to this transfer for $40,000, and you can make mine up for the balance. He went away and didn't say when he would come back, he didn't say anything about not having this deal until he came back. He came to me, and told me to write the contract, and what to do, and I just did what he told me. He didn't tell me he had to see his associates before he closed the deal, when I made this contract with him. I didn't know at that time he had associates. I didn't know at that time that R. M. Waggoner and Clois Green, K. N. Hapgood, and A. C. Parks, and these other parties, had an interest in the lease. When I wrote the contract, I told this agent to go and get the man's name and attach it to the contract. That was Armstrong. He went up and introduced me to Priddy. I don't think I knew where Priddy's office was; I went there with Armstrong. He introduced me to Priddy, and I told him I had the contract there—told Priddy—which Lesh had directed me to make from the Godley Oil & Gas Company to him, and I read it to him, or gave it to him and he read it, and I told him it was to take the place of the one that was in escrow in the bank; that I had agreed with Mr. Lesh to let this take the place of the other. I said, 'I wrote the other one, and I wrote this, and they are virtually the same, except perhaps the name and date and amount.' Then I said something about the abstract—when the abstract was brought down to date. I said, 'As far as the conditions in this one, that is the same as the other one—virtually the same way,' I said. The abstract has been examined, and has an opinion from every lawyer in town as far as the title is concerned. Mr. Bullington has examined the abstract for me on some of the land. I told him I understood Weeks had the abstract then, and every lawyer in town had passed on it so far as I knew, and has an opinion on it, and he looked it over and agreed to it, and said that was perfectly all right, and I told him to give me a check then for the amount, and he wrote out the check, and I went to the bank and had it certified to."

The record shows that Armstrong was a broker in the city of Wichita Falls and that Lesh approached him with reference to selling the lease, and that Armstrong brought Lesh and Priddy together on the morning of the 17th, and that Armstrong accompanied Moore to Priddy's office, and his testimony with reference to the occurrence as related by Moore, in regard to making the contract from the Godley Oil & Gas Company with Priddy, is substantially the same as that of Moore. The record shows the check given by Priddy was payable to the order of the Godley Oil & Gas Company for $20,000 and is dated April 17, 1916. There was indorsed on the face of the check: "Good. W. L. Robertson, Cashier." This check was indorsed on the back, "Godley Oil & Gas Company, by W. M. Moore, President," and it shows that it was paid April 23, 1919, through clearing house, and there is also a check for $30,000, payable to the order of the Godley Oil & Gas Company, by Priddy, indorsed on the back in the same way as the first. The contract between Priddy and the Godley Oil & Gas Company, dated April 17th, recites:

"This contract, made this the 17th day of April, 1919, by and between Godley Oil & Gas Company, a corporation, by W. M. Moore, president, party of the first part, and by W. M. Priddy, of Wichita Falls, Tex., party of the second part," etc.

It is in form substantially the same as the one executed to Lesh April 12th, except as to the amount and the payment, which are, as stated, by Priddy in his testimony and Moore by his. On April 21st there is an instrument purporting to be an assignment by the Godley Oil & Gas Company, to W. M. Priddy for the 20 acres in question, reciting the payment of the $50,000 stipulated for in the contract of April 17th; also there is an assignment from the Godley Oil & Gas Company to F. P. Lesh of the 20 acres in question for the recited consideration of $40,000, paid. This assignment recites that J. J. Taylor, acting as vice president, and L. W. Parrish, secretary, duly authorized by resolution, made the conveyance for the reason that W. M. Moore, president of the company, had refused to carry out the orders of the board of directors of

said company and execute the instrument in accordance with the orders passed and spread upon the minutes. The evidence in this case also shows that this 20 acres of land was near to or adjoining the tract of land upon which a well was being sunk, known as the Burk-Waggoner well, and then nearing completion. There is evidence to the effect that on the 16th of April, and possibly the morning of the 17th of April, there was considerable doubt among the owners of the various leases as to whether or not the well would be a producing' one, but it seems from the testimony some time during the 17th that it became reasonably certain that the well would be a producing one, and in fact it did come in a producing and a famous well of great value. This, perhaps, will be sufficient of the evidence in this case to dispose of the issues presented.

We will consider first the third assignment and proposition, which are to the effect that the peremptory instruction should not have been given because the contract was merely executory for the assignment of an oil and gas lease for a term of years, which lease did not vest in the lessee any title to the land or any part thereof, but was personal property, and not real estate, requiring a contract in writing. The original lease recites that for and in consideration of $1 paid to R. M. Waggoner and his wife, by A. R. Calloway, and the further consideration of the expenses and labor incurred in the drilling of the well thereafter stipulated on some one of the tracts of land in the vicinity of this land, and the covenants and agreements thereafter contained, granted, demised, leased, and let to the lessee, his heirs, executors, and administrators, successors, and assigns, for the purpose of drilling, mining, and operating for oil, etc., laying pipe lines, building tanks, tower stations, and structures thereon, to produce and take care of said productions of said land, situated, etc., describing the land. It was agreed this lease shall remain in full force for the term of five years from date, and as long thereafter as oil or gas, or either, is produced from said land by the party, his heirs, administrators, executors, etc. The lessee was to deliver to the lessors, their heirs or assigns, one-eighth part of all oil produced and $300 each year for gas from each well, etc. The lessee, in consideration of the grant, and as a consideration for the rights, privileges, and options thereafter given, "agrees to begin a well on some one of the tracts leased by him in the vicinity of this land within 120 days from the date hereof, and to complete such well after it is so begun with due and reasonable diligence and within 90 days from and after the completion of said well, to begin drilling a well on this land, or to pay at the rate of $1 per year per acre for said land herein leased, payable quarterly in advance for each year, that the drilling of the wells herein provided for are delayed not to exceed the life of this lease, as hereinabove provided, until the well may have been completed on the land," the completion of such well operated as a liquidation of the rents. If the well was not begun or the rents paid, the lease became inoperative as to both parties upon the lessee paying to the lessors $10. The payment of such sum and the other consideration gave the lessee the "right and option theretofore in the paragraphs mentioned." This contract has the usual clause of burying pipes, paying damages to growing crops, and for making payments falling due, etc. "It is agreed that all the covenants and agreements herein set forth between the parties hereto shall extend to their successors, heirs, assigns, executors, and administrators." This instrument was duly acknowledged by Waggoner and his wife, and properly filed for record.

[1, 2] We think the instrument evidences more than a mere license to go upon the land. A mere license is a personal privilege to do some act on the land without passing any estate therein. The conveyance by the licensee or licensor would revoke it. A casual reading of the instrument in question shows that the right granted was more than a personal privilege. It is a demise and a lease to the lessee and his heirs and assigns, etc. All the covenants extend to their successors, heirs, executors, etc. It is for a term of 5 years and as long as oil and gas are produced from the land.

"No estate of inheritance or freehold, or for a term of more than one year, in lands and tenements, shall be conveyed from one to another, unless the conveyance be declared by an instrument in writing, subscribed and delivered by the party disposing of the same, or by his agent thereunto authorized by writing." Article 1103, R. C. S.

Our Supreme Court we think has settled the question here presented. An owner of land had given a party operating a ferry permission for landing and fastening of the ferry's boat to his land. Afterwards the original owner sold the land, and his vendee fenced up the road leading to the ferry, and refused to permit the land to be used as a landing place for the boat. It was asserted by the ferryman that the original owner's permission vested in him a continuing right, which could not be revoked. It was said in that case, after quoting the statute:

"Whether the right acquired in the land of Rutherford [the original owner] be denominated an easement or a license, it cannot be conveyed except by writing. In 18 Am. & Eng. Ency. of Law it is said: 'While a license proper may be created orally, if that which is given is equivalent to an estate in the land, it is not strictly a license, and a writing sufficient to satisfy the statute of frauds is required.' Cook v. Stearns,

11 Mass. 537. In the case last cited the court said: 'Licenses to do a particular act do not in any degree trench upon the policy of the law, which requires that bargains respecting the title or interest in real estate shall be by a deed or in writing. They amount to nothing more than an excuse for the act, which would otherwise be a trespass. But a permanent right to hold another's land for a particular purpose, and to enter upon it at all times without his consent, is an important interest, which ought not to pass without writing, and is the very object provided for by our statute.'" Parsons v. Hunt, 98 Tex. 420, 84 S. W. 644.

Whether the instrument in question shall be designated a conveyance of an interest in land or a lease, it conveys an estate which by the terms of the instrument itself is one of inheritance, and for a term of more than one year. Estate, as used in the statute, we think signifies the quantity of interest which a person has from an absolute owner down to naked possession. Bouvier's Law Dictionary, vol. 1, p. 1075. The statute uses the terms "inheritance" or "freehold," which are terms of established meaning in law. "Inheritance" simply means the method by which children or relatives take property from another at his death. Whether the estate created by this instrument be termed a corporeal or incorporeal hereditament under our statute, the right thereto must be given in writing. The contract gives the right to enter, mine, sink wells, lay pipes, and erect structures as long as oil is found. The lessee had thereby a right for this particular purpose which will descend to his heirs or may be assigned by him. This is the right conveyed, whether it is termed a conveyance, grant, demise, or lease. "Demise" signifies a conveyance, either in fee, for life, or for years. It imports a covenant for quiet enjoyment. It has been stated by some courts that an oral agreement to deliver a certain share of oil to be produced from land, when put in tanks, is an agreement to give an interest in land, and is within the statute. Heller v. Dailey, 28 Ind. App. 555, 63 N. E. 490. An oil and gas lease, giving the lessee the right to explore lands and remove therefrom the oil and gas, is a contract for the transfer and sale of an interest in land, and must be in writing. Beckett, etc., v. Backer, 165 Ky. 818, 178 S. W. 1084; Kline v. Guaranty, etc., 167 Cal. 476, 140 Pac. 1; Osborne v. Arkansas, etc., 103 Ark. 175, 146 S. W. 122. Our courts, and others sometimes, hold, where a licensee is granted a license to enter on land with the permission of the lessor, and makes permanent and valuable improvements, equity will prevent a revocation; but in making a contract authorizing the entry on land to prospect and procure oil, gas, or other minerals therefrom, as we understand our decisions, such right creates an estate in land, such as will require a writing. Benavides v. Hunt, 79 Tex. 383, 15 S. W. at page 398;

Southern Oil Co. v. Colquitt, 28 Tex. Civ. App. 292, 69 S. W. 169; McEntire v. Thomason, 210 S. W. 563; Texas Co. v. Daugherty, 107 Tex. 226, 176 S. W. 717, L. R. A. 1917F, 989. In the latter case the Supreme Court considered the question of taxation; that is whether the right created by the instrument amounted to an interest taxable as land against the grantee, separate from the fee taxable against the owner. After reviewing the authorities from the various courts, and citing Guffey v. Smith, 237 U. S. 101, 35 Sup. Ct. 527, 59 L. Ed. 856, said:

"According to these decisions, it is immaterial whether there is any such thing as absolute ownership of oil or gas in place. They plainly announce that the conveyance of such minerals in place, with a right to the use of the land for their extraction from the earth, which may prove, under the instrument, of unlimited duration, creates a freehold interest in the land itself."

In that case the Supreme Court expressly approved the holding in the Colquitt Case, supra.

[3, 4] If the contract is a lease, which it may be in a sense, under the holding of Pierce, etc., v. Woodrum, 188 S. W. 245, then it is for a longer term than one year. The right demised is for five years and as long as oil or gas is produced therefrom. It is held by several courts, ours as well as others, that a contract for the lease of land would ordinarily be regarded in effect a contract for the sale of an interest in land, and so within the provision of the statute, if for a longer period than one year. Tiffany on Landlord & Tenant, vol. 1, § 66; Dority v. Dority, 96 Tex. 215, 71 S. W. 950, 60 L. R. A. 941. The contract in question conveys an interest in the land; that is, the right to go on the land and explore for oil, and do the things named in the instrument. It was not unilateral, but a consideration was paid, and the promises and covenants of the lessee we think enforceable, and a sufficient consideration. Pierce, etc., v. Woodrum, 188 S. W. 245.

[5] The lessee in this case was required to begin operations within 120 days or pay the rentals during the extension period. It was evidently the purpose of the parties that the estate created should constitute a present grant; that the lessee should perform the agreement on his part after taking possession rendering such covenants conditions subsequent.

"A fee [and we hold a lesser estate] may pass by deed upon a condition subsequent to the same extent as though the condition did not exist, subject to the contingency of being defeated, according to the condition; and here, if any property was conveyed, there was a present grant, but liable to be defeated by the grantee's failure to perform the requirement in respect to beginning operations for the drilling of a well for oil or gas, or, in lieu thereof, making

the quarterly payment provided." Texas v. Daugherty, supra; Law of Oil and Gas, by Wilkerson & Richardson, p. 120; Aycock v. Paraffine Oil Co., 210 S. W. 851.

[6] The assignment of a lease which is required to be in writing must also be in writing. Beckett, etc., v. Backer, 165 Ky. 818, 178 S. W. 1084. We take it also a contract to assign the interest vested by a lease for a term of more than one year should be in writing. Article 3965, R. C. S.; Dial v. Crain, 10 Tex. 444; Gardner v. Sittig, 188. S. W. 731.

"The words, 'any contract for the sale of land,' as used in the statute, include every agreement by which one promises to alienate an existing interest in land upon a consideration, either good or valuable. * * * 'The effect of the provision, as expounded by the courts, is to render unavailing to the parties, as the ground of a claim, any parol contract, in whatever shape it may be put, by which either of them is to part with real estate.'" Sprague v. Haines, 68 Tex. 215, 4 S. W. 371.

The above article of the statute does not require the authority of an agent, duly authorized, to be in writing to make an enforceable contract for the sale of land, as does article 1103, to convey such land, in the latter instance the agent must be "thereunto authorized by writing." Huffman v. Cartwright, 44 Tex. 299; Marlin v. Kosmyroski, 27 S. W. 1042. When a party has an estate in land by virtue of an executory contract, it cannot be reconveyed orally, but the same character of evidence is required to show the reconveyance as is required to show the contract for the sale. Sanborn v. Murphy, 5 Tex. Civ. App. 509, 25 S. W. 460; Ed. (by Supreme Court) 86 Tex. 437, 25 S. W. 610.

[7] It seems to be settled by our Supreme Court in Heffron v. Pollard, 73 Tex. 96, 11 S. W. 165, 15 Am. St. Rep. 764, which is followed by our other courts.

"If * * * the principal be disclosed, and the face of the writing shows that the agent is bound, it is presumed that the other party has elected in the contract itself to look to the agent, and the principal is not liable upon it." Garcia v. Yzaguirre, 213 S. W. 236.

In the latter case the Commission of Appeals, speaking through Judge Montgomery, cites Mechem on Agency, §§ 1420, 1423, 1712, and 1713 (2d Ed.), as stating that the weight of authority is opposed to the proposition that a disclosed principal cannot be held liable in the contract of an agent executed in his own name for the benefit of the principal. We take it the purpose of the Commission of Appeals was not to overrule Heffron v. Pollard, by citing Mechem on Agency, as to the weight of authority, but seeks to differentiate the case in hand from the Pollard Case. This is evidenced, we think, by the final conclusion of the court and the judgment rendered, and also the holding that the face of the instrument itself in that case disclosed the principal, at least as to part of the land.

The record in this case shows, under the undisputed facts, that Priddy had no contract in writing from Lesh to convey or assign the 20 acres of land in question. It is not contended that Lesh ever, by an instrument in writing, reconveyed the land to the Godley Oil & Gas Company, or that he signed the contract to Priddy from that company, or that the face of that instrument showed that he was the principal in such contract. It is also uncontroverted that Priddy knew that Lesh had the assignment or contract for an assignment of the lease to the 20 acres and was the contractual owner thereof, under the Godley Oil & Gas Company's first contract of April 12th. Under this record, and under the authorities in this state, Priddy acquired no interest in the twenty acres by a writing from Lesh, under his contract. The fact that he had an oral agreement with Lesh to buy it for the sum stipulated and on the terms specified under the statutes of fraud vested in him no interest. The case is therefore stripped to the issue of estoppel alone.

It is insisted by the appellees that Moore was not authorized to execute the contract by Lesh; that is, to deliver it to Priddy and take the money and other things necessary to complete the transaction. Without discussing the evidence, we think the evidence raises the issue of his authority to draw the contract as it was drawn, and to present it to Priddy for his approval and signature, especially when taken in connection with his invitation to Armstrong who was the agent or broker who brought Lesh and Priddy together, to accompany him and obtain the money; at least, it was a question for the jury.

[8] The instruments in writing show, we think, as to the lease on the 20 acres, the legal title was in the Oil & Gas Company when the transaction was had with Priddy. The condition upon which the assignment was to be made, as provided in the contract with Lesh, had not happened. He was required thereby to pay $40,000 upon the exhibition of an abstract showing title, such as called for by the contract. The title had not been accepted by Lesh. If the title was not such as required by the contract, Lesh would not have been required to take the assignment, and would not have forfeited the $20,000 deposited with the contract. If he did not pay the balance within the time specified, he could not have enforced an assignment. His interest was executory and equitable. According to Priddy, Lesh agreed to sell, and to fulfill his contract induced Priddy to accept the contract of the company, which held the legal title, and to pay the money to it. In this way Priddy did get a memorandum in writing, contracting to assign the lease from the holder of the legal title. The party representing the legal title assured Priddy that Lesh and

the company had agreed to substitute him in the place of Lesh in the former contract, and he could pay the money to the company. If such facts are established, to permit Lesh to defeat Priddy's contract on the ground of the statute of frauds, and because he was not disclosed in the contract under such circumstances, would be a fraud on Priddy. It is a general principle, both at law and in equity, that when a party, by his declaration or conduct, has induced another to act in a particular manner, which he otherwise would not have done, such party will not be permitted to set up a claim inconsistent with such declaration or conduct, if such claim will work an injury to the other party. Mayer v. Ramsey, 46 Tex. 374. See facts in that case.

The case of Storrs v. Baker, 6 Johns. Ch. (N. Y.) 166, 10 Am. Dec. 316, is referred to in the above case. A wife, during coverture, devised to her husband 6½ acres of land. After her death her husband conveyed to Storrs for a valuable consideration. Baker, the father of the deceased wife, advised the husband to sell, and told him he thought his title good. He stated he did not claim the land by inheritance, when asked on behalf of Storrs, the purchaser. The devise to the husband was void, because the wife was a feme covert at the time of making the will. The father, therefore, actually owned the land by inheritance when it was conveyed to Storrs by the husband. Baker, in suing for the land, claimed that he was ignorant of his right when the conveyance was made and when he disclaimed that right. It was said in that case, in effect, where one having title acquiesces knowingly in the disposition of his property by a person pretending title, he is bound by that disposition, and especially if he encouraged the parties to deal with each other. It was also held the assertion of the father that he did not know the will was void would not relieve him; and it was further held, it may be said, that Storrs was, equally with Baker, presumed to know the will of a feme covert was void. The court said that Storrs had good reason to presume that the will of the daughter had been recognized or authorized by Baker, and that Storrs also had the right to presume his title as heir had been duly waived or abandoned.

So we may say in this case, under the representations, Priddy had the right to presume Lesh had properly relinquished his interest in the lease, and placed the equitable as well as the legal title in the oil company. We have assumed the oil company, acting through Moore, was the agent, and Lesh the principal, in the transaction with Priddy. The relation is nearer that of trustee and beneficiary, or vendor and vendee under an executory contract; the trustee or vendor being vested with the legal title, with the right to sell—at least, Priddy had the right to so infer. We believe, if the facts are as stated by appellant, appellee should be estopped from denying the oil company's right to contract and assign to Priddy.

[9] Appellee, having applied to the equity powers of the court in this case, cannot complain that the rules of equity are applied in determining the rights of the parties, instead of enforcing the strict rules of law as to conveying or contracting to convey an interest in land. We think we are supported in our holding by the decisions of our courts. As bearing on the issue we cite the following cases: Moore v. Tarrant County, etc., 31 S. W. 709; Stanley v. Epperson, 45 Tex. 645; Dycus v. Hart, 2 Tex. Civ. App. 354, 21 S. W. 299; Hughes v. Landrum, 40 Tex. Civ. App. 196, 89 S. W. 85; Robertson v. Monning Dry Goods Co., 211 S. W. 535; Allen v. Berkmier, 216 S. W. 647.

[10] Of course, the position of Priddy must have been changed, and he must have suffered injury, such representation and conduct. He gave his check for $20,000, payable to the order of the oil company. This check was duly certified by the cashier of the bank. This had the effect to withdraw that amount from Priddy's account or fund in the bank. Priddy signed the contract, thereby obligating himself to pay to the company $50,000. He assumed the hazard of the well, upon which all parties were then buying and selling, being a failure. If it had been a failure, his obligation to pay the amount would not have been affected, and doubtless he could have been held to his undertaking. It resulted, however, that the well proved to be a large producer, which made the contract valuable. He had given his check, and it had been certified, and the contract signed by him and placed in the bank, before he learned that Lesh and his associates had determined to repudiate the contract. The subsequent events ought not to affect the validity of the contract, after the first payment and the execution of the contract with its obligations. We therefore believe the evidence raised the issue of estoppel.

[11] It is insisted by appellee that Moore, as president of the corporation, had no authority to make or sign the contract to assign. This, too, is an issue of fact under the circumstances of this case, which the testimony raises, and was for the jury. If, however, the contract was nonenforceable because of lack of authority on the part of Moore as against the corporation, under the facts of this case this would not alone, we think, defeat title by estoppel from Lesh. We believe the principles announced by Mr. Justice Boyce, speaking for this court, in the case of Allen v. Berkmier, 216 S. W. 647, applicable to such condition. We see no reason why the Godley Oil & Gas Company should be a party to this suit. If Moore had authority from the company and Lesh or his associates to contract and to assign, his assignment would put the title in Priddy; if he did not, whatever interest the company had was vest-

ed in appellees by the assignment of the vice president and secretary. The settlement of the rights of the parties to this action will settle the title to the interest held by the company. As to the rights of Roberts & Hill, and whether they are innocent purchasers, this, too, is largely a question of fact, and for the jury under the evidence. We have not undertaken to determine the relation between Lesh and his associates, whether that of a partnership or joint owners, or whether it was necessary for all to sign the contract. The question can be determined upon a trial, if it should be an issue, and whether the contract would bind Lesh's interest alone or the interest of all. The appellees cite the case of Cauble v. Worsham, 96 Tex. 86, 70 S. W. 737, 97 Am. St. Rep. 871, as holding estoppel will not apply in this case because of the statute of frauds. As we understand that case, it holds, because of the statute requiring a married woman's acknowledgment to be taken before a conveyance of her separate real estate can take effect, that a conveyance cannot be effected of her equitable interest in land by estoppel.

We will not discuss the ninth and tenth assignments further than to say we think there was no error in admitting the resolution of the directors of the corporation, complained of in the ninth assignment. We believe the evidence set out under the tenth assignment admissible under the issues presented in this case as to Moore's authority, but do not determine whether it was reversible error in excluding such evidence.

The judgment of the trial court will be reversed, and the case remanded.

### On Motion for Rehearing.

[12] It is asserted that we were in error in finding that Lesh personally told Priddy that the sale to him by the Godley Oil & Gas Company had not been consummated. We did not intend so to state, but this information was imparted by Moore before the contract was signed by Priddy, and, as we regarded Moore as the agent of Lesh, we thought that it was immaterial which one told Priddy. At any rate, Priddy learned that Lesh was not the unconditional owner of the land before executing the contract.

[13] It is also asserted that we were in error in stating that Armstrong was the agent of Lesh. Perhaps the record required a finding that his relationship was that of a go-between. Priddy inquired of Armstrong for land near the well. Armstrong called on Moore, inquiring of him if he had land. Moore visited Lesh and obtained permission to sell the land, and it appears agreed upon a division of the commission if the sale was effected to Priddy. Armstrong took both Lesh and Moore to Priddy, and after the trade returned with Lesh to Moore, and it is inferable that Lesh recognized that he owed the commissions on the deal. Whether he knew Armstrong and Moore were acting together in the matter we think unnecessary to determine. Moore had the right as agent to sell, and Armstrong found the purchaser, and all appear to have known he was acting as a broker in the matter. All these facts as to the exact relationship we regarded as immaterial, further than to show they were acting together in getting the contract signed and the money thereon.

[14] In the original opinion we stated Priddy knew Lesh was the "contract owner" of the lease to Lesh, and that under the authorities and the facts Priddy acquired no interest under a writing from Lesh. It is possible such conclusion may not be entirely accurate. The contract had not been delivered to Lesh up to the time of this trade with Priddy, but it, together with Lesh's money, was in escrow in the bank, to be delivered and an assignment executed upon the happening of certain conditions. The conditions had not yet happened, so as to vest title or interest in the land, either legal or equitable. It was unexecuted, and could not be executed until the conditions were performed, as stipulated. In other words, up to that date no estate was created in the land in favor of Lesh. In this particular this case is distinguishable from the case of Sanborn v. Murphy. Under that case an estate or interest was created by performance of the conditions, and it appears that the bond had been delivered to the obligee. It would seem the facts in this case bring it more nearly under the rule announced in Bullion v. Campbell, 27 Tex. 653. It was held in that case an oral assignment of a bond for title was not within the statute, as the assignment was not the contract sought to be enforced. See, also, Anderson v. Powers, 59 Tex. 213. It has been held, where a contract has been deposited in escrow upon conditions, that the title does not vest until the performance of the conditions. Scott v. Childers, 24 Tex. Civ. App. 349, 60 S. W. 775. The fact that under the contract appellees would have a right within the time specified to perform the condition and thereby create an estate in land, does not, before performance, create such an interest as would require, under our statutes, a writing to assign the contract. As finally consummated, the agreement of all parties was to substitute appellant for Lesh in the contract.

[15] In a sense the oil company was a trustee, holding the legal and equitable title for the beneficiary thereunder. It seems that such a trustee may, at the request or solicitation of the beneficiary, convey the title to whom he may direct, and if he does so the beneficiary would be estopped to afterwards assert title. This has been said frequently in a negative way. Brown v. Harris, 7 Tex. Civ. App. 664, 27 S. W. 45. It is well recognized in this state that the vendor, in an executory contract, may, in default of the payment of the purchase money, convey the

title. He holds the title in trust for the payment of the debt. So we think a party may waive his right to pay the money and complete the transaction. Where he has done so, we see no reason why estoppel by waiver may not be applied. It is permissible for a party with a legal right to waive it, and when his conduct has induced another to rely upon such waiver he should be estopped. Building & Loan Ass'n v. Stewart, 94 Tex. 447, 61 S. W. 386, 86 Am. St. Rep. 864. Some of the cases cited in the original opinion are to the effect that the conveyance by the vendor passes the title, where the vendee refuses to comply with the conditions or waives the right to do so; the courts holding, where his acts or conduct influences another to purchase, the vendee is estopped from afterwards asserting title.

"If one, by acts or words, intentionally makes another believe that he has no right or interest in property, with which the other is dealing, or has abandoned his right, and the party acts on the state of things so presented, and is thereby misled, then the party inducing such action cannot claim his interest or right in the property." Simkins, Equity, 671.

[16] It is insisted that Priddy knew that Lesh had a contract, and therefore was not induced by false representations to change his position; but in this appellees overlook an important factor, in creating estoppel, which influenced Priddy to believe Lesh had "abandoned his right" under his contract. His agent, Moore, who was also the president of the company informed Priddy that he and Lesh had agreed that Priddy could be substituted for Lesh in the contract. We believe this was calculated to lead Priddy to believe that Lesh had or would abandon his right under his contract, and especially so when he had presented to him a contract executed by the company. Lesh's agent accepted Priddy's money on that contract, and bound him by it to pay $30,000 more. Under such circumstances, we do not think Priddy was called upon to ascertain if all the necessary formalities had been performed. If they had not abandoned the former contract, they perpetrated a fraud on Priddy. They cannot be heard to say, if Priddy had been diligent, he would have learned that what they said was not true. It does not comport with right and fair dealing for one, who by his misstatements leads another to rely upon his words and agreement, to assert that the party so misled ought to have known what was said was in fact false, and that it was not the purpose to carry out their representations. The following cases bear on this question: Morris v. Gaines, 82 Tex. 255, 17 S. W. 538; Fielding v. Du Bose, 63 Tex. 631.

[17] Contracts within the statute of frauds are not void or illegal, the enforcement of which is only suspended until the provisions of the statute are satisfied. Browne on Statute of Frauds, § 115a; Robb v. Railway, 82 Tex. 392, 18 S. W. 707; Binghurst v. Texas Co., 39 Tex. Civ. App. 500, 87 S. W. 893; Edwards v. Old Settlers, 166 S. W. 423. In this case, under appellant's theory, it was agreed to substitute him in the contract with the oil company. This was done, and the company, through its president, executed to him its assignment of the lease. The statute of frauds do not apply where the oral contract is executed. Central Land Co. v. Weems, 73 Tex. 252, 11 S. W. 270. In this case the contract was made, and was executed as provided by the statute of frauds, by the company authorized to execute it. Possibly the question is not the statute of frauds, if appellant shall establish a case as claimed by him. The question may be: Which assignment conveys the title, that held by Lesh or Priddy?

[18, 19] There is another reason we would suggest, and that is Priddy is not relying on the oral contract with Lesh, but on his contract in writing, executed under the circumstances detailed in his evidence. In other words, he is not trying to specifically enforce an oral contract. The appellees assail his written assignment, and seek to show that, although an oral contract was made to sell Lesh's right, yet it was not in writing. The appellant replies by showing that the contract and assignment upon which he relies was induced and accepted as a satisfaction of the oral contract, at the direction of the appellee Lesh. He ought, we think, to be permitted to defend his legal title by showing that appellees are without equity. If Lesh induced or influenced the making of the contract as it was made, we think the appellant was entitled to show it; and if appellant was induced to believe Moore, as president, was authorized to make the contract and bind his company, Lesh would be estopped from asserting otherwise, even though there was no authority given Moore by the directors of his company. The principles of estoppel heretofore discussed would control such condition.

[20, 21] We think the payment of the money and executing the contract shows such a change in Priddy's condition as would inflict an injury on him, which would permit him to avail himself of estoppel. The mere fact that after making the contract Lesh tried to rescind did not affect Priddy's right. He had entered into a contract, paid his money, and had the right to stand on the contract as consummated. It was argued before us that the check marked "Good," signed by the cashier, was not a certification. "A check may be certified by a bank by writing upon it the word 'Good,' or any other similar words, which indicate a statement by it that the drawer has funds in the bank applicable to the payment of the same, and that it will so apply them." Banks and Banking, Michie, "Deposit," § 145, vol. 2, p. 1171, and note, citing Bank v. Whitman, 94 U. S. 343, 24 L. Ed. 229. The object of the certification is to use the check

as money. Section 145, Id. So the check certified placed $20,000 in the hands of Lesh's agent, as much so as if it had been money. The facts of this case raise the issue of injury to Priddy. It will be unnecessary, as we conceive it, to discuss the benefits to Lesh and the effect of the subsequent transaction by the oil company.

We believe the motion should be overruled.

---

⬅═For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes