## W. H. CARMAN, Respondent, v. M. HARRAH, Appellant.

### Kansas City Court of Appeals, October 5, 1914.

1. **CONTRACTS: Modification: Cause of Action on Contract as Modified.** Where parties have entered into a contract, even a written one, and afterwards a new or modified contract is made, the old contract is thereby abrogated and abandoned; and, when suit is brought, declaration must be made on the new contract or the contract as modified. Nor does nonperformance of the new have the effect of reinstating the old.

2. ———: ———: ———: **Consideration.** The substitution of a new contract for an old one is a sufficient consideration.

3. ———: **Agency: Liability of Agent and Principal: Election.** Where an agent has contracted in terms sufficient to bind himself personally, then, although the agent has disclosed the fact that he is acting as agent and also discloses the name of his principal, the party with whom he contracts may elect to hold either, but he cannot hold both. And if such party with full knowledge of the facts elects to hold the principal, he thereby discharges the agent.

Carman v. Harrah.

Appeal from Jackson Circuit Court.—*Hon. Frank G. Johnson,* Judge.

REVERSED.

*E. R. Morrison* and *L. Newton Wylder* for appellant.

*James G. Smith* and *Newton C. Gillham.* for respondent.

TRIMBLE, J.—This is a suit brought November 7, 1912, to recover a cash payment of $1556.20 made by plaintiff on a contract, dated June 8, 1907, for the purchase of certain land in Texas.

The contract was signed by plaintiff and defendant, but the land was in fact owned by The International Land Company, a corporation, of which the defendant, Miss Mary Harrah, was secretary and treasurer. The company had an office in Kansas City, Missouri. The land was in defaudant's name because, under the laws of Texas, a foreign corporation could not own land in that State for speculative purposes.

The theory to which plaintiff clings in his attempt to recover of this defendant the cash payment made on the contract is that defendant was in reality the owner, or that at the time the contract was signed he thought that defendant was the owner of the land and that the International Land Company was acting merely as a selling agent. (An analysis of plaintiff's own evidence, hereinafter made, will disclose whether he thought this or not.)

The petition sets out the contract and the cash payment made thereon and then charges that "although he was at all times after said 8th day of June, 1907, ready and willing to comply with all the terms of said contract, but that defendant could not at said

time and cannot now convey a good title to said premises.''

The petition further alleged that defendant falsely and fraudulently represented to plaintiff that she was the owner of the land and was able to comply with the terms of the contract; that she did so for the purpose of inducing the plaintiff to part with the $1556.20; that plaintiff believed said false and fraudulent representations and paid said money; that plaintiff ''has at all times since said 8th day of June, 1907, been ready, able and willing to carry out the terms of said contract on his part, has repeatedly offered so to do, and has repeatedly demanded of defendant that she carry out the terms of said contract on her part, or failing so to do, to return him his money paid on said contract as aforesaid.  Plaintiff says defendant has at all times refused to comply with the terms of said contract or return said money so paid, and has fraudulently converted to the use of defendant said $1556.20.''

It will be observed that the petition seeks to recover the cash payment upon the theory that defendant breached the contract whereby plaintiff was entitled to consider it at an end and demand his money back.  The breach and right to recover are stated in two different ways, but possibly do not constitute two different grounds.  The first is that although plaintiff was on the date of the contract ready and willing to comply with its terms yet ''defendant could not at said time and cannot now convey a good title to said premises.'' The second is that plaintiff was fraudulently deceived as to defendant's ownership of the land, but has been ready and willing to carry it out on his part and has repeatedly offered to do so and has demanded that defendant keep her part thereof or return him his money.

The answer of defendant was first a general denial; also that plaintiff never paid half of the purchase price according to the contract which required this

to be done before he could demand of defendant a warranty deed; also, that defendant had no interest in the contract, that she received no money from plaintiff, that he paid her none, but paid it to the International Land Company well knowing that the said company owned the land and well knowing the capacity in which defendant acted, and that plaintiff elected to pursue his remedy against the Land Company by filing his claim for the money herein sued for with the receiver of the company after it failed in business and plaintiff never made any claim that defendant owed him anything until the institution of this suit. The answer also pleaded the five year Statute of Limitations.

Did plaintiff know that he was really contracting with the International Land Company although the contract was signed by defendant? We think this question is important because, if he did, then the large question in the case, regardless of alleged errors in the trial, is, can plaintiff recover of this defendant. As stated, plaintiff's theory is that he did not know the company was the real party he was dealing with.

Plaintiff was a resident of Indiana. He was induced, either by agents or advertisements of the International Land Company to come to Kansas City and go down to Texas with its president, John U. May, and look at the land there had for sale. While down there he executed the contract sued on. By the terms thereof he agreed to pay $4676.10 for the land, of which amount $1556.20 was paid in cash, and the remainder, $3119.90, was to be evidenced by notes of even date with the contract (which was dated June 8, 1907), whereby he was to pay $778.10 on or before June 1, 1909, a like amount on or before June 1, 1910, and the balance, $1563.70, on or before June 1, 1911. When one-half of the purchase price had been paid he was to receive a warranty deed with abstract showing good title. This contract was signed by plaintiff and defend-

ant. Before it was signed, however, plaintiff understood perfectly well with whom he was dealing. He was told that the company could not hold the land in its name and that for this reason the title stood in the name of the defendant and the contract was made in her name. Toward the end of the trial plaintiff claimed he thought when he signed the contract that the Land Company was agent for the defendant and that she was in fact the owner of the land. But here is what he testified to at the outset: ''Q. When was the first time you heard of that company called the International Land Company? A. Probably about a week before I started from my home in Indiana.'' He then testified he saw advertisements that said John U. May was president of the company and that Miss Harrah was its secretary and treasurer. He then testified that the terms of the contract were talked over. ''Q. And that is the time that you found out the company owned the land? A. *That is the time that I found out first —that I first knew who owned the land.* Q. That the International Land Company owned the land? A. *Yes, sir, that's the first I knew the International Land Company owned the land,* and that Miss Harrah had to have the land in her name for the company couldn't own the land in Texas.'' Thereafter the contract was submitted to him for his signature. Other admissions contained in letters by plaintiff hereinafter referred to show that he knew he was dealing with the Land Company.

After the contract was executed, plaintiff returned to Indiana. And on October 21, 1907, the Land Company wrote plaintiff that it had sent his deed and abstract to the land to a bank there where he could pay the remainder of the first half of the purchase price, but that the deed did not express the same terms as the contract with reference to the deferred payments. Plaintiff wrote to the Land Company refusing to agree to the new terms. Under the terms of

the contract he had signed, he had until June 1, 1910, in which to finish paying one-half of the purchase price which he was to do before he was entitled to a deed. Plaintiff is in error in thinking that the payment of the first note of $778.10 on June 1, 1909, even had it been made would have completed the payment of one-half the purchase price. When he received the above-mentioned letter from the Land Company he made no demand on defendant, or anyone else, that the original contract be carried out, nor did he offer to pay the remainder of the first half of the purchase price then or at any other time.

On November 26, 1907, the attorney for the Land Company wrote plaintiff saying that the company had informed him that plaintiff was not willing to accept the changes made. And, in explaining how the mistake was made in the original terms, this letter told plaintiff "At the time you made this purchase the land *had just been bought by the Land Company,* and the party selling you the land was not familiar with the terms of purchase, and it is impossible for them to comply with their contract as specified." He then suggests different terms as to the deferred payments and says: "If this is not satisfactory, then you can return the abstract and deed you have, and the company will resell the land as soon as possible, and pay you back your money and expenses, and six per cent interest for the time they have had same. It is a matter of regret to them that they cannot comply with their original contract." To this plaintiff replied (writing again to the Land Company, not to defendant). This letter was not introduced in evidence but evidently he agreed to the proposition the company made to him that the company would resell the land to some one else and repay him his money with interest. We say this because on December 11, 1907, the International Land Company wrote plaintiff a letter saying: "We are in receipt of your favor of the 10th inst.

regarding the land purchased by you under contract.
. . . We will accept your proposition and send you
a check so it will reach you by January first.'' To
this plaintiff replied on January 20, 1908, (again ad-
dressing the International Land Company) saying: ''I
have received a letter from you dated December 11,
1907, stating that you would accept my proposition
in regard to our deal and in regard to the land I bought
from you and that you would send me check for the
money to reach me by January 1. I haven't received
the check or heard from you since. Let me hear from
you at once. I had arranged to use the money. If poss-
ible send it by return mail or let me know just what you
are going to do in regard to it. If you mean for me
to keep the land I want to know it at once.'' To this
letter the Land Company replied January 21, 1908,
saying, ''We are in receipt of your favor of the 20th,
and in reply thereto will say we have not disposed
of the land as yet. We had a party that said he would
take it but he could not make arrangements for his
money, owing to the tight money market, but we will
endeavor to show it again on this trip, and see what
we can do with it. Just as soon as we sell it we will
let you hear from us.

Yours very truly,

INTERNATIONAL LAND COMPANY

By JOHN U. MAY,

President.''

On April 13, 1908, plaintiff wrote the Land Com-
pany as follows: ''I wish you would let me hear from
you in regard to our deal on the land in the Hubbard
Ranch in Texas. I would like to have this matter
closed. Please let me hear from you *what the prospects
are.''* To this the Land Company replied, ''We are
in receipt of your favor of April 13th regarding your
tract of land, and can only say that the same has been
sold under contract, but the people will not be able

to come through with their money until some time in June. As soon as the deal is completed you will hear from us without delay.

Yours very truly,

INTERNATIONAL LAND COMPANY,

By JOHN U. MAY,

President."

Evidently plaintiff's proposition was that he was willing the company should resell the land and then repay him his money.

Plaintiff waited during the summer of 1908 for the Land Company to resell the land to some one else and repay him his money but not receiving it, he stopped in Kansas City, on his way to Texas with other parties, and saw May with reference to his contract. He says he talked to both May and the defendant who was present, but he did not address the latter specifically and it is clear that May and he did all the talking. He says he did not "say much of anything to her," meaning defendant.

In this conversation he was told that the land had been sold to some one else, and May told plaintiff he would give him other land in Texas in place of the land he had contracted to buy because that land could not be conveyed to him.

Plaintiff went to Texas and was there shown a piece of land to be conveyed in lieu of the land plaintiff had contracted for in the first place. Plaintiff returned home and on October 14, 1908, decided to accept the other land in lieu of that described in the contract, and wrote the International Land Company to that effect saying he would take certain quarter sections marked on the plat by May, and that a partner of his, Lawson, would take the rest, and the money he (plaintiff) had paid on the original contract, $1556.20, together with what Lawson had paid, was to be counted in on the whole and any difference in

the payments made by him and Lawson were to be equalized between themselves. In the statement of the money paid and to be paid under the new contract, plaintiff placed this item:

*"Money paid International Land Company* to be accepted as first payment on this land

Mr. W. A. Lawson paid . . . . $ 696.00
W. H. Carman paid . . . . . 1556.20

$2252.20

The money paid the International Land Co. overpays our first payment . . . . . $92.20."
No answer was received to this, and plaintiff on November 9, 1908, wrote May saying: "I have been hoping for some word from you in regard to our deal on the land in Texas. Please let me hear from you at once. Just what you mean to do in regard to the matter. If you can't agree to settle the way you proposed I shall take the matter up with the International Land Company at once." To this May replied on November 24, 1908, "I am in receipt of your favor of the 9th inst., on my return from Cleveland yesterday after an absence of about four weeks, and I will take the matter up at once and have a deed gotten ready for you and am very glad indeed this matter can be fixed up in this way. Trusting this will find you in good spirits, I remain."

The foregoing shows that plaintiff knew he was dealing with the International Land Company as the real owner of the land when he signed the contract, and also that thereafter he was told so in the first letter written him as early as October 21, 1907, and his correspondence and dealings ever thereafter show that he fully understood that he was dealing with the International Land Company not as agent of defendant but as the disclosed principal for whom defendant was acting when she signed the contract sued on.

The foregoing also shows further that, instead of looking to defendant to perform the contract or return the money, plaintiff *made a new contract with the Land Company in lieu of the old one.* It also is quite clear that upon the International Land Company's failure to carry out the new contract, the plaintiff still further elected to pursue it for the money here sought to be recovered by filing his claim with the receiver of said company; and that no claim was ever made against defendant until after the lapse of four years, during which time the company failed and, at the time demand was first made upon her, defendant was no longer in a position where she could recover from the Land Company any loss she would sustain by reason of being held personally liable on the contract. She ceased to hold title to any land for the company in 1908. During these four years plaintiff never in any manner took the matter up with her personally or made any demand on her that she should repay him any money or transfer any land to him. No demand was made on her at the time of plaintiff's visit to Kansas City in the fall of 1908, as is now urged, because plaintiff says, "I don't know that I talked with her at all." The evidence shows that if plaintiff had made such a demand in proper time defendant could have taken steps to have protected herself. This last fact, however, is perhaps of comparatively small concern or moment inasmuch as defendant did not plead estoppel. But the fact that for four years plaintiff made no claim on defendant is important as showing that he understood well enough at the time that his dealings were in reality with the company and not with this defendant.

There was no evidence whatever showing that defendant made any fraudulent representations concerning the ownership of the land; and none that plaintiff offered to pay the one-half of the purchase price entitling him to a deed. And, in view of the specific allegations of the petition, it may be questioned wheth-

er there was any proof to support plaintiff's petition. However, as the attorney for the International Land Company wrote to plaintiff on November 26, 1907, that it was "impossible for them to comply with the contract," this may obviate the necessity of plaintiff's making a formal tender of the amount necessary to complete the payment of the first half of the purchase price, since the letter may have been tantamount to saying that they would not execute a deed on the terms agreed upon. It is a very serious question, however, whether this letter furnishes proof that "a good title could not be conveyed at that time" as the letter showed that the trouble was merely because certain deeds of trust on the property fell due at times in the future different from what the parties thought at the time the contract in suit was drawn; and the evidence showed that a title could be made, since the title was afterwards conveyed to another. This conveyance, though, could not be considered a breach of the contract because plaintiff consented that the Land Company should resell and pay him his money back. Plaintiff's consent may perhaps have been made on condition or with the understanding that the company would repay him, and hence we do not care to say there was an absolute and total failure of proof.

Was there a new or modified contract entered into between plaintiff and the company represented by John U. May? If so, does the failure to perform the modified contract give plaintiff the right to go back to the original contract and sue upon that, or must he rely upon the new contract?

Plaintiff contends that no new contract was entered into. But we think there was. While in Texas the last time, that is, in the fall of 1908, the time May proposed to sell plaintiff certain land in lieu of the other land, May marked the new land on a plat and gave it to plaintiff. Upon returning home, plaintiff wrote May: "Mr. Lawson and I have decided to ac-

cept the proposition of the land in section 13, on the three-quarters, as marked on the enclosed plat of the land, southeast and southwest quarters and northeast quarter, or the northwest quarter if you prefer. We prefer just as you marked, you to make me deed and abstract for the two quarters long way north and south. Mr. Lawson for the other south quarter in section 13, the money that Mr. Lawson and I paid you to apply all together, Mr. Lawson and I to settle the difference what little there is between us." And in this letter plaintiff proposes to treat the $1556.20 he is now suing for as the cash payment made on this new contract. To this May replied that he would "take the matter up at once and have a deed gotten ready for you, and I am very glad indeed this matter can be fixed up in this way." These two letters show that a certain definite proposition was made on one side and accepted on the other. So there was a new contract entered into by which other land was to be sold plaintiff and the $1556.20 he had paid on the old contract should be applied on the new.

It is a well-established rule that where parties have entered into a contract, even a written one, and afterwards a new or modified contract is made, the old contract is thereby abrogated and abandoned, and when suit is brought declaration must be made on the new contract or the contract as modified. The subsequent contract supersedes the prior one. [McClurg v. Whitney, 82 Mo. App. 625, 631; Chouteau v. Jupiter Iron Works, 94 Mo. 388, 395; Lanitz v. King, 93 Mo. 513, 519; Housekeeper Pub. Co. v. Swift, 97 Fed. 290.] Parties to a contract have a right to make a new one and its substitution for the first one is a sufficient consideration. [Peters & Reed Pottery Co. v. Folckemer, 131 Mo. App. 105.] Where a new contract has been substituted for a former one, plaintiff's remedy is upon the new contract, and nonperformance of the new does not have the effect of reinstating the old.

[Sioux City Stockyards Co. v. Sioux City Packing Co., 81 N. W. 712, 716; Napa Val. Wine Co. v. Daubner, 65 N. W. 143.] Where one contract is thus substituted for another there is no want of consideration, and the party suing must declare upon the new contract and that without regard to whether the stipulations of the new contract were ever performed or not. [Babcock v. Hawkins, 23 Vt. 558.]

In 39 Cyc. 1350, it is said "Contracts for the sale of land may be modified or new contracts substituted therefor by subsequent agreement between the parties, and modification may be by implied as well as by express agreement in respect of changes which may be made by parole. Thus contracts may be modified by . . . changing . . . the description of the land to be conveyed." It is perhaps true that a modification which changes the land to be conveyed cannot be done by parole since that would contravene the Statute of Frauds. But in the case at bar, the letters written and the marked plat referred to therein are sufficient to make the new contract not a parole but a written agreement.

In Sanders Pressed Brick Co. v. Barr, 76 Mo. App. 380, 386, it is said that it is a "well-settled rule that a valid contract made in substitution for one of a prior date annuls the obligation of the former and of itself furnishes a sufficient consideration for the release of the first agreement. [Bishop on Contracts, Sec. 68; Lancaster v. Elliott, 55 Mo. App. 255; Wirst v. Schuman, 67 Mo. App. 172; Pim v. Greer, 64 Mo. App. 175.]"

In Chrisman v. Hodges, 75 Mo. 413, it is held that "a contract in writing which is complete and perfect in itself and not ambiguous in its terms, will be held to supersede a prior written contract in relation to the same subject-matter; and parole evidence will not be admitted to show that such was not the intention of the parties."

In Montgomery Extr. v. American Central Ins. Co., 108 Wis. 146, 159, it is said: "But this court has frequently decided that a written agreement may subsequently be modified by the parties even by an oral agreement and that such modification need not rest upon any new consideration. . . . This is a mere reiteration of the rule stated long ago by Lord DENMAR, C. J., when he said that 'the same consideration which existed for the old agreement is imported in the new agreement which is superseded for it.' [Stead v. Dawber, 10 Adol. & E. 57 at 66.]"

From the foregoing it may be seen that a new contract was substituted for the old; and merely because the new one was not performed does not authorize plaintiff to go back to the old one and found his petition upon it.

In addition to this, plaintiff not only by accepting a new contract but also by filing his claim against the International Land Company elected to hold it, and such election released defendant.

Where an agent has contracted in terms sufficient to bind himself personally, then, although the agent has disclosed the fact that he is acting as agent and also discloses the name of his principal, the party with whom he contracts may elect to hold either, but he cannot hold both. Undoubtedly, plaintiff knew before he signed the contract in suit that Miss Harrah was merely the agent for the Land Company, and that the money he paid was in reality paid to the company. In addition to the facts showing this, hereinbefore related, plaintiff admitted he wrote a letter in which he said, "I paid the International Land Company in cash $1556 dollars."

The contract bound the Land Company even though it was signed by the agent's name only. [Haubelt Bros. v. Mill Co., 77 Mo. App. 672, 680, 681.] The last clause of the Statute of Frauds (Sec. 2783, R. S. Mo. 1909) which provides that "no contract for the sale

of lands made by an agent shall be binding upon the principal unless such agent is authorized in writing to make said contract'' does not change the result in this case because the Land Company recognized, in writing, the contract made by the agent. This satisfied the statute as to it. [20 Cyc. 257; Heideman v. Wolfstein, 12 Mo. App. 366.] Nor is it necessary that the writing be contained in one paper. Certainly the Land Company, being the real party to the contract and having received the money thereon, was bound thereby, at least to the extent of being bound to return the money if it did not perform.

So that if the contract bound both defendant and the company then plaintiff had the right to hold either, but if with full knowledge of the facts material to his rights, (which knowledge he undoubtedly had in this case) he elected to hold the Land Company, then he thereby discharged the defendant, who was its agent. Or, had he elected to hold the agent he would have discharged the Land Company. [31 Cyc. 1578; Ames Packing Co. v. Tucker, 8 Mo. App. 95; French v. Price, 24 Pick. 13, 22; Clealand v. Walker, 11 Ala. 1058, 1065; Paige v. Stone, 10 Met. 160, 169; Schepflin v. Dessar, 20 Mo. App. 569.] On page 574 of this Dessar case Judge THOMPSON suggests that the election is all the more binding where the changed circumstances of the parties have made it unjust or inequitable to permit the parties to pursue the defendant. And such is the case here, for the evidence shows that for a long time, while plaintiff was dealing with the Land Company as the party he was seeking to hold as responsible, it was a going concern, and if Miss Harrah had known that she was to be held personally she could have taken steps to protect herself. But in 1908, not knowing she was liable on plaintiff's contract, she voluntarily ceased to hold the title to the company's Texas lands. So that this feature of the case is important to this extent, even though estoppel has not been pleaded.

From the foregoing we think it appears that plaintiff is not now entitled to recover of this defendant. Consequently, it is unnecessary to consider the questions raised as to other alleged errors in the trial of be case. The judgment is reversed. The other ., ... .. .ur.