MILLER et al. v. DEAHL et al. (No. 1900.)*

(Court of Civil Appeals of Texas. Amarillo. Feb. 15, 1922. On Motion for Rehearing, March 22, 1922.)

1. Escrows ⟐⟐8(1)—Delivery of oil and gas lease in escrow held not to convey title until conditions performed.

Where an oil and gas lease was delivered to a bank in escrow, its delivery in escrow could convey no title to the lessees until the conditions of the contract were performed.

2. Escrows ⟐⟐6 — Oil and gas lease in escrow held not complete until operations were begun.

A contract under which an oil and gas lease was placed in escrow held to contemplate that no title should vest in the lessees until a standard drilling outfit should be placed upon the premises and drilling operations commenced with it.

3. Escrows ⟐⟐9—Extension of time for installing standard drilling rig held not a waiver of requirement as to kind of rig in escrow agreement.

Where an oil and gas lease was placed in escrow under a contract providing that delivery to the lessees should not be made until a standard drilling outfit should be placed on the premises and drilling operations commenced with it, a written instrument, extending to the lessees the time within which they might place the standard rig on the premises, held a mere extension, and not a waiver of the requirement for a standard rig instead of a star rig.

4. Frauds, statute of ⟐⟐56(1)—Contract specifying conditions of escrow need not be in writing.

A contract, specifying the condition on which an instrument is placed in escrow, is not within the statute and need not be in writing, but may rest in parol, or partly in writing and partly in parol.

5. Escrows ⟐⟐9—Requirement for installing standard drilling rig on oil lease held not waived.

Where a contract placing an oil and gas lease in escrow provided that delivery of the lease to lessees should not be made until a standard drilling rig was installed, that the lessors assisted lessees in organizing a corporation for acquiring more acreage in the vicinity held not to constitute a waiver on the part of the lessors of the requirement that a standard and not a star rig was to be installed.

6. Estoppel ⟐⟐52 — Requirements of waiver enumerated.

A waiver may be express or implied, but in the absence of an express agreement a waiver will not be presumed or implied contrary to the intention of the party, whose rights would be injuriously affected thereby unless by his conduct the opposite party has been misled to his prejudice into the honest belief that such waiver was intended or consented to.

7. Frauds, statute of ⟐⟐156—Statute held not to enter into question of abandonment of escrow agreement.

A lease deposited in escrow, though within the statute, is not involved in an issue as to abandonment by subsequent leases of the escrow agreement; and, the escrow agreement not being within the statute, the statute does not enter into the question of abandonment, though it is contended that the subsequent leases were not signed by parties sought to be charged with the abandonment by reason thereof.

8. Frauds, statute of ⟐⟐63(1) — Modification, rescission, or abandonment of escrow contract provable by parol.

Since an escrow contract is not within the statute of frauds, it can be modified, rescinded, or abandoned without complying with the statute, and proof thereof by parol is admissible.

9. Escrows ⟐⟐9 — Finding that oil and gas lease contract had been abandoned.

In a suit to compel delivery of an oil and gas lease placed in escrow, evidence held to sustain a finding that the contract under which the lease was deposited in escrow had been abandoned.

10. Mines and minerals ⟐⟐78(1)—Time of essence of contract for leasing and operation.

Time is of the essence of contracts providing for the leasing of oil and gas lands and for commencing operations thereon.

11. Contracts ⟐⟐317—Failure to perform substituted contract not a revival of original one.

A failure to perform a substituted contract does not revive the original one.

On Motion for Rehearing.

12. Appeal and error ⟐⟐842(1)—When waiver a question of law stated.

Where the facts and circumstances relating to the subject are admitted or clearly established, waiver becomes a question of law not binding on an appellate court.

13. Appeal and error ⟐⟐1101—Court of Civil Appeals not bound by findings of fact nor conclusions of law below, even if consented to.

Courts of Civil Appeals are not bound in all cases by findings of fact of either the jury or the trial judge, nor by conclusions of law filed in a trial court, even where appellee agrees that such findings are supported by evidence, or that such conclusions are correct.

Appeal from District Court, Potter County; H. S. Bishop, Judge.

Suit by Will A. Miller, Sr., and others against G. W. Deahl and others. Judgment for defendants, and complainants appeal. Affirmed.

---

⟐⟐For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Writ of error refused May 10, 1922.

Stone, Miller & Guleke and C. E. Gustavus, all of Amarillo, for appellants.

Madden, Trulove, Ryburn & Pipkin, of Amarillo, for appellees.

HALL, J. W. A. Miller, Sr., W. A. Miller, Jr., and Stuart Miller, a partnership, doing business under the firm name of W. A. Miller & Sons, sued G. W. Deahl, C. E. Deahl, R. L. McSpadden, J. W. Lawrence, W. F. Dawson, S. B. Vaughn, S. B. Motlow, W. N. Thompson, F. N. Davis, G. D. Whitsett, R. A. Blackshear, and R. A. Underwood, together with the First National Bank of Amarillo, to compel said bank, which it is alleged held an oil and gas lease in escrow, to deliver the same to the appellants. It is alleged, in substance that G. W. and C. E. Deahl executed an oil and gas lease on March 9, 1918, upon 9,000 acres of land owned by them in Carson county, to the appellants, which lease was placed in escrow with said bank; that by the terms of the contract the lease should be held by the bank, subject to the terms of the agreement providing, in substance: (1) For a careful geological survey of the lands by a competent geologist, at the expense of appellants within 6 months from the date of the contract, copy of the geologist's report to be furnished to the lessors; (2) if the geologist's report proved to be favorable appellants were to begin drilling on the land with a standard drilling rig within 12 months from the date thereof, and to continue such operations until oil or other minerals were found in paying quantities; (3) that if the report of the geologist was unfavorable the obligations were at an end; (4) that as soon as drilling commenced with a standard outfit the bank should deliver the lease to appellants. Appellants further alleged that they had complied with the terms of the escrow contract, and were entitled to demand the delivery to them of the oil and gas lease; that because of the interference and objections of the lessors, the Deahls, the bank had refused to make delivery.

The defendants, McSpadden, Lawrence, Dawson, and others, were sued as sublessees of the appellants, and, with the exception of Blackshear, they either disclaimed or quitclaimed all interest in the lease in question.

The lessors G. W. and C. E. Deahl answered by general denial, the two-year statute of limitations, and, further, that appellants had not complied with the terms of the escrow contract; that they had not placed a standard rig on the premises within 12 months and commenced drilling; that they never in fact began drilling with an outfit capable of making a thorough bona fide test within the time limit, nor had they made the deposit as provided in the oil and gas lease contract. They further alleged an abandonment by appellants of the original contract and of all claims and rights thereunder, and that they recognized and admitted that they

had failed to comply with the terms of the contracts, and had treated the same as at an end; that they had entered into other negotiations along other lines, and sought to make, and did make, other contracts in regard to leasing said lands, thereby showing their abandonment of said original contracts, and recognizing their failure and inability to perform the same; that the appellants had contracted with one Seigfried for the drilling of a well on the leased premises, had caused the lessors to execute an oil and gas lease, conveying to J. B. Beard for their benefit, a part of the leased premises, which was deposited in escrow with C. E. Gustavus; that the original contract between the parties was of no further effect, and should be canceled.

By supplemental petition the appellants pleaded specially that because of the contract with the sublessees McSpadden et al., whereby it was understood and agreed that a star rig might be used, the lessors had waived and abandoned the standard rig requirement, and were estopped to claim forfeiture of the lease because of appellant's failure to use such a rig. Further waiver, abandonment, and estoppel was pleaded against lessors, in that they acquiesced in the use of the rig used, and that operations were begun on February 17, 1919; that drilling was commenced February 19, 1919, which continued up to March 15, 1919, and during all of said time no objections were made by appellees. They allege a substantial compliance with the escrow contract and the oil and gas lease, and that all preparations were being made to erect a standard derrick to be used at a proper time. They allege full compliance with all the obligations resting upon them, set up their ability and willingness to go forward under the contract, and further specially alleged that the lessors have waived compliance with the strict terms of the escrow contract, in that on March 15, 1919, the rights of appellants were recognized by the lessors by written instrument of that date, by the terms of which appellants were relieved of the obligation to further drill, and that on May 15, 1919, the lessors recognized the rights of appellants by their said contract of that date with Seigfried, by the terms of which the lessors bound Seigfried to drill a well on the leased premises to a depth of 3,000 feet, said well to be drilled with pole or accommodation tools; that as a consideration to appellants for agreeing to surrender their lease the lessors were to relieve appellants of drilling obligations, and to deliver to J. B. Beard an oil and gas lease upon 3,960 acres of the leased premises, but that said lease was never delivered to Beard. Wherefore the consideration for the agreement on the part of appellants to surrender the original lease had failed.

It is further alleged that the offer of the lessors to appellants was upon condition that Seigfried comply with the drilling contract

he had made with lessors, and that Seigfried had never complied therewith. Whereby neither appellants nor lessors were bound; that lessors had directed that the lease of 3,960 acres to Beard be not delivered; that because appellants had placed the rig upon the premises and commenced drilling they were entitled to delivery of the lease. They further allege that, relying on an agreement made by lessors on or about February 4, 1919, that the star rig could be used, the appellants had purchased the same at a cost of about $8,000 and also bought extra tools; had said rig shipped from Healdton, Okl., and had with said rig drilled to a depth of 140 feet; that the lessors agreed to delay 10 or 12 days in getting the rig upon the leased premises, and that a standard derrick could be placed on the ground after drilling had been started.

The lessors replied with supplemental petition, by alleging that there was no consideration for the agreements, waiving the requirements of the original escrow contract and lease. They pleaded the two-year statute of limitation, abandonment by the parties of the contract of March 15, 1919, implied rescission of the original escrow contract and lease by appellants' conduct in getting the lessors and Seigfried into the drilling contract of March 15, 1919.

By second supplemental petition the appellants alleged that the Seigfried contract and the Beard lease were placed in escrow to be delivered only upon condition that Seigfried should comply with his contract to drill; that Seigfried did not comply; that the lessors had prevented the delivery of the lease, and were estopped to plead the Seigfried contract and the Beard lease as constituting an abandonment of the original lease and escrow agreement by appellants. A trial before the court without a jury resulted in a cancellation of the original oil and gas lease, removing the cloud cast upon the lessors' title by the appellants and the claims of the sublessees. The court filed its findings of fact and conclusions of law in substance as follows:

(1) The execution of the escrow contract and of the oil and gas lease, as set forth in the petition.

(2) The execution and delivery of the contract of sublease or transfer between appellants and sublessees.

(3) The nonperformance of obligations of said contract of sublease by sublessees and of the original lease of March 9, 1918, and of the escrow contract of that date and the mutual abandonment of the assignment contract by the parties thereto, and that the lessors, by acquiescence and entering into other negotiations and contract with appellants, thereafter adopted and ratified such abandonment.

(4) That appellants did not within 12 months place a standard rig on the leased premises, and that the lessors waived the re-quirements of the original contract as to a standard drilling rig; that appellants placed a star rig upon the premises within the time required by the contract, and in good faith began drilling operations; that the lessors acquiesced in and permitted the use of said star rig and equipment, and that appellants proceeded with drilling until March 16, to about 195 feet, when they ceased drilling, left the rig and equipment thereon, and have not since resumed operations.

(5) The execution of the contract of March 15, 1919, for the forming of a corporation, etc., between appellants and the lessors, in which the original leased premises, as well as other lands to be procured, were to be used, the corporation to be known as the Antelope Peak Oil Company; that articles of incorporation were prepared and attempt made to procure additional lands, which failed, the mutual abandonment of the corporation project, and that said contract never became effective.

(6) That after appellants and lessors had mutually agreed to abandon the contract of March 15, 1919, and on May 15, 1919, and at the same time, the Deahls executed the J. B. Beard lease, and placed it in escrow with C. E. Gustavus, and executed the Seigfried contract, the lease to be held by Gustavus pending the performance of the drilling contract between the Deahls and Seigfried. It was understood that it was for the sole benefit of appellants, and Beard was only the nominal lessee.

(7) That during the negotiations resulting in the Deahl-Seigfried contract, W. A. Miller, Jr., in his own handwriting, made a plot of 9,920 acres described in the lease of March 9, 1918, designating portions to be surrendered to the lessors, also the portion to be described in the Beard lease, and the portion covered by the Seigfried lease, that part of the premises going to Beard being marked M, that part to the lessors being marked D, and Seigfried's portion being otherwise marked, and that the plot became a part of the contracts between the lessors and Seigfried and Beard.

(8) Seigfried did not begin drilling operations upon that part of the premises leased to him prior to July 1, 1919, and did not comply with his contract.

(9) That W. A. Miller, Jr., wrote the letter dated Wichita Falls, Tex., June 26, 1919, to C. E. Deahl, one of the lessors.

(10) That the appellants did not pay the lessors any sum of money provided for in the original lease contract of March 9, 1918, nor did Beard or Seigfried pay any sum provided for in the contract of May 15, 1919, for delay in drilling operations.

(11) There was no surrender or forfeiture by appellants of their original oil and gas lease of March 9, 1918, prior to the execution of the lease and escrow contract between the lessors and Seigfried, and the lease con-

tract between the lessors and Beard of date May 15, 1919; that appellants demanded the delivery to them of said oil and gas lease after drilling was commenced by them, and that appellants were entitled to the possession of said lease but for the fact that after making such demand and before any delivery thereof they voluntarily entered into other negotiations, to wit, the contract between appellants and sublessees of December 2, 1918, and the Antelope Peak contract between lessors and appellants, of March 15, 1919, and that they thereby waived any right to have said original oil and gas lease delivered to them at that time, and but for the further fact that while drilling operations were suspended appellants, by their own procurement, entered into negotiations with the lessors, which resulted in the Seigfried contract and the Beard lease dated May 15, 1919, all of which negotiations and contracts as a whole constituted one contract, by which appellants are bound, and which is inconsistent with and supersedes and was substituted for the original contract of March 9, 1918.

The court's conclusions of law are in the main a repetition of his findings of fact, except that in his fifth conclusion of law it is stated that the Deahl-Seigfried contract and the Deahl-Beard lease of May 15, 1919, operated as a revocation of all previous contracts, and were by agreement substituted for the original contract of March 9, 1918, and that the letter from W. A. Miller, Jr., to C. E. Deahl of June 26, 1919, was a legal and binding admission that the contract of March 9, 1918, had been finally terminated, and that by reason thereof appellants were not entitled to a delivery of the oil and gas lease.

[1] The delivery in escrow of the lease to the bank could convey no title to W. A. Miller & Sons until the conditions were performed. Until performance the contract was executory. Priddy v. Green (Tex. Civ. App.) 220 S. W. 243; Blue v. Conner (Tex. Civ. App.) 219 S. W. 533. Performance which would entitle the Millers to possession of the lease and vest title in them must be strictly in accordance with the terms of the escrow agreement. Thornhill v. Olson, 31 N. D. 81, 153 N. W. 442, L. R. A. 1916A, 502, and note, Ann. Cas. 1917E, 427; Frichott v. Nowlin (Tex. Civ. App.) 50 S. W. 164.

The first question then to be considered is, Has there been any such performance on the part of W. A. Miller & Son as would vest any title to the premises described in the lease in them? The trial judge found that they did not within 12 months place a standard rig on the leased premises, but that the lessors waived this requirement; that appellants placed a star rig upon the premises, and in good faith began drilling operations, and in effect finds that this was a compliance with the terms of the escrow agreement. There is no dispute as to the facts, but we do not assent to the court's conclusions of law. The lease is dated March 9, 1918, and is the form commonly known as producers' form No. 88. The fourth paragraph is as follows:

"If operations for the drilling of an oil or gas well are not begun on said land on or before the first day of March, 1919, this lease shall terminate as to both parties unless the lessee on or before that day shall pay or tender to the lessor or deposit to the credit of lessors, in the First National Bank at Amarillo, Texas (which shall continue as the depository regardless of changes in ownership of the land), the sum of $500.00, which payment or tender may be made by the check or draft of the lessee and however made, shall operate to confer on the lessee the privilege of deferring the commencement of said well for six months from said date; thereafter, in like manner, and upon like payments or tenders of said amount, the commencement of said well may be further deferred for additional periods of six months successively, provided always that this lease cannot be kept in force by such payments, in the absence of drilling operations for a longer period than ten years from the date last above set forth," etc.

W. A. Miller testified that the lessees had never paid any rent or other money consideration for the lease, but that they "took it for test purposes." The escrow contract which is duly executed by all the parties, is also dated March 9, 1918, and provides for a geological survey of the land, and further provides in part as follows:

"Third. If said geological survey and report should prove favorable, parties of the first part shall place on said leased premises, at such location thereon as they may deem most advisable, a standard drilling rig within a period of twelve months from the date of this contract, and shall begin drilling for oil or other minerals named in said lease contract immediately and shall continue such drilling with reasonable diligence and without delays except such delays as may be unavoidable until a thorough bona fide test is made for oil, gas or other minerals named in said lease contract. * * *

"Fifth. As soon as said standard well drilling outfit shall be placed upon said premises and drilling operations begun, then the said oil and gas lease contract hereto attached shall be in force and effect and the same shall be delivered by said First National Bank of Amarillo to the lessees therein named, subject, however, to be avoided and set aside by parties of the second part hereto, should parties of the first part hereto fail or refuse to comply with the conditions and provisions of paragraph 3 of this agreement."

[2] No other construction can be placed upon the language quoted than that no title should vest in the lessees until a standard drilling outfit should be placed upon the premises and drilling operations commenced with it. It is conceded that a standard rig, as contemplated, has never been placed upon the premises. Appellant, however, contends that the following instrument, executed by C. E. Deahl, one of the lessors, on January

25, 1919, was a waiver of the requirement for a standard rig, and an agreement that drilling might be commenced and ·continued with a star rig:

"This is to certify that we, the undersigned, G. W. Deahl and C. E. Deahl, entered into a certain lease contract with Will A. Miller & Sons, for oil and gas development on certain lands belonging to said G. W. Deahl and C. E. Deahl, and said contract called for one standard rig, for the purpose of drilling for oil and gas, on said land, wherein the said Will A. Miller & Sons agreed to forfeit said lease contract to G. W. and C. E. Deahl, should they fail to have the said standard rig in operation on or before March 9, 1919, on the said land of G. W. Deahl. On or about January 6, 1919, the said G. W. and C. E. Deahl, by request of R. A. Blackshear, R. L. McSpadden and Guy V. Stumpff, acting in behalf of a syndicate or company to whom the said Will A. Miller & Sons had given a sublease on said land, waived that part of the contract which specified a standard rig and gave their consent that the said R. A. Blackshear, R. L. McSpadden and Guy V. Stumpff, representing the parties to whom the sublease had been given, should place upon said land one certain star rig instead of the standard rig, as specified in the contract and begin the drilling on said land with fifteen-inch bit on said star rig, and continue drilling with same until such reasonable time as may be required to transport and place on said land the standard rig as specified in original lease contract made between G. W. and C. E. Deahl, and Will A. Miller & Sons, and that G. W. and C. E. Deahl did grant an extension of time to said R. A. Blackshear, R. L. McSpadden and Guy V. Stumpff, representing the parties to whom Will A. Miller & Sons had given a sublease on said land beyond the time specified in the original lease contract of March 9, 1919, which extension of time would be sufficient to enable them to dismantle, transport and erect said standard rig on the above land, said standard rig to be shipped from Claremore, Okl., to St. Francis, Tex."

[3] Construing this instrument upon its face, it is simply an extension of the time in which the Millers and their assignees might have to place the standard rig upon the premises. The time granted is such time as will enable them to "dismantle, transport and erect said standard rig on the above land"; the writing clearly indicating that the rig referred to is at Claremore, Okl. It is admitted that the star rig was inadequate for the purpose of fully exploring and developing the lease. Looking to the facts, it is clear the parties never intended to waive for all time the requirement in the escrow contract for a standard rig. After the execution of the lease, on March 9, 1918, and before any title had vested in the Millers on December 2, 1918, they, in writing, had assigned their rights in part under the contract to R. A. Blackshear and, others, whereby it was provided that the assignees should explore the land. Nothing was done by the lessees or their assignees toward development until the 25th day of January, 1919, when Blackshear

and those interested with him, believing that an interest had vested in the Millers, and that it had been acquired in part by them, and realizing that the time for compliance was drawing near, went to Panhandle and consulted with C. E. Deahl, and obtained the foregoing extension contract. Later, on or about the 7th day of February, W. A. Miller, Sr., went to see C. E. Deahl, for the purpose of getting an extension of time for placing the standard rig upon the premises, and was then told by Deahl that the extension had been granted to the assignees. He carried one Meade with him, and testified that after talking the situation over with Deahl he said:

"Mr. Deahl said these parties [Blackshear and others] had already been out there and made a contract with him for the same thing that we were after, to get a star rig and use it until they could get a standard. He didn't object to the star rig at all. He said the other parties had already been out there, and he had agreed to accept the use of the star rig for the time being as long as they could use it, and get a star rig."

C. E. Deahl's testimony with reference to a conversation he had with Blackshear et al. about the star rig, and the contract concerning it, is in substance as follows:

"Now, in regard to the latter part of that contract which refers to dismantling and shipping a standard rig from Claremore, Okl., to St. Francis, Tex., they said they would load the standard rig immediately. That was the next day they would begin to load this rig, and they would ship it out there the next day following; that is, they would ship it the next day following the day they were talking to me, and would show me a bill of it, and that is the agreement by which I allowed them to put the star rig on, if they would show me billing that it had been shipped to St. Francis. They said they would show me a billing that it had been shipped immediately, but they did not say as to how many days it ought to be in—and they said it ought to be in inside of 8 or 10 days afterwards. The standard rig was not shipped to St. Francis and put on my land—if there was ever one shipped I didn't know it, and never saw the billing that it had been shipped. * * * I never had any conversation or writing with Will A. Miller or either of the Millers in which I said anything about relieving them from placing a standard rig on those lands prior to March 9, 1919."

The contract between the Millers and their assignees bound the latter to procure leases of 8,000 acres additional land, and provided that they should be released from all obligations upon giving to the Millers 30 days' previous notice of their intention not to fulfill their contract. They failed to procure the additional land, and upon giving the required notice about the last of January, 1919, were released. Our conclusion is that the requirement for a standard rig was not waived by the extension agreement, but that the effect thereof was simply a temporary postpone-

ment of that requirement.. Neither was the requirement waived by the conduct of the lessors up to the time drilling was commenced with the star rig. Therefore the appellants were not then in a position to demand a delivery of the lease.

[4] The weight of authority is to the effect that the contract specifying the condition upon which an instrument is placed in escrow is not within the statute of frauds, and need not be in writing, but may rest in parol, or partly in writing and partly in parol. Green v. Simpson (Tex. Com. App.) 231 S. W. 375, 21 C. J. 868, § 7. 1 Dev. on R. E. 312a.

[5, 6] The next inquiry is: Have the lessors, since drilling was commenced with the star rig, waived the requirement? It is not asserted that they have expressly waived it, except by the execution of the above-mentioned extension agreement, which we have held is not a waiver. It appears from the record that, after Blackshear and others, as assignees of a part interest under the Millers, abandoned their contract, an effort was made by appellants, with the co-operation of the lessors, to organize a corporation or a joint-stock association, which it was understood should acquire more acreage in that vicinity, and by which development should be prosecuted. It cannot be insisted that this would constitute a waiver on the part of the lessors. It is said that a waiver may be express or implied, but in the absence of an express agreement a waiver will not be presumed or implied contrary to the intention of the party whose rights would be injuriously affected thereby, unless by his conduct the opposite party has been misled to his prejudice into the honest belief that such waiver was intended or consented to. To make out a case of waiver of a legal right, there must be a clear, unequivocal, and decisive act of the party showing such a purpose, or acts amounting to an estoppel on his part; or it must be supported by an agreement founded on a valuable consideration. 27 R. C. L. 909, § 5; Merchants' Mutual Insurance Co. v. Lacroix, 45 Tex. 158; Dikes v. Miller, 24 Tex. 417; Phillips v. Watkins Land & Mortgage Co., 90 Tex. 195, 38 S. W. 270, 470. It further appears that after the plan to incorporate had failed, the lessors, at the instance and request of appellants, entered into a contract on the 15th day of May, 1919, with C. A. Seigfried. C. E. Deahl testified, with reference to this transaction, as follows:

"After we found that we could not carry out our contract for a corporation, or agreement for a corporation, and that was abandoned, the next matter that was taken up between us and the Millers with reference to these lands was the Seigfried contract. Mr. Seigfried was a Pennsylvania Dutchman. I met him here at Amarillo, and was introduced to him by Will A. Miller, Jr. That Seigfried contract was entered into, I think, the next day after Mr. W. A.

Miller introduced me to Mr. Seigfried. It was immediately after I arrived in Amarillo on the occasion that Mr. Seigfried came in and Mr. Miller introduced him to me at Mr. Miller's office. When he introduced me to Seigfried he told me who Seigfried was and what he wanted to do. Mr. Miller told me that Mr. Seigfried wanted to go out there and drill that land out, and he was a man we could rely on, and he said he would be glad for us to enter into a contract with Mr. Seigfried. He told us that he was backed up by some big companies, and said he was satisfied he could go ahead and drill this out; that he was representing some company in the East, and said that he could get some leases from this Empire Oil & Gas Company. They had a few leases out there, and he said he could get leases from them to put in with this lease, and he said that he was in with the ——— close to the Gas & Empire people. Mr. Miller said he was very anxious for us to enter into a contract with Mr. Seigfried, and he said, 'It is up to you and your father to make a contract with Mr. Seigfried, and we will be very glad to make this contract and go in with the man.' He said, 'He can drill this out, and has got timber lands of his own and he has got two different rigs that he can get his hands on in a little bit.' He was very anxious for us to go into this contract with Mr. Seigfried. Mr. Miller was present when the contract signed by Seigfried and I was made and when it was signed. Mr. Miller was instrumental in having that contract drawn. It was drawn between Seigfried and us; that is, we gave the contract to Seigfried. My father and I signed the contract to Mr. Seigfried. After this form 88, producers' lease, which has been read in evidence, was signed, it and the contract was put up in escrow."

[7, 8] It further appears from the record that 2,000 acres of the original 9,920 acres was transferred to Seigfried, and as part of the same agreement the Millers and the lessors each took 3,960 acres, the acreage set apart to the Millers being, at their request, assigned to J. B. Beard. It cannot be successfully contended that up to the execution of the Seigfried contract the Millers had complied, even substantially, with the original agreement. The appellants' contention is that, since they did not sign the Seigfried contract or the lease to Beard, under the statute of frauds they cannot be charged thereby, and that the court erred in holding that the Seigfried and Beard leases constituted an abandonment of the original contract, and were substituted therefor. In our opinion the statute of frauds does not enter into this question. The original lease, which is a contract within the statute, is not involved in this issue. It has never been delivered, and appellants have not shown themselves entitled to it. The escrow contract is the one which has been breached, and we have held that it is not within the statute. It can therefore be modified, rescinded, or abandoned without complying with the statute of frauds, and proof thereof by parol is admissible. 1 Devlin on Real Estate, par. 312a; 13 C. J. 593–595; 1 Black on Rescis-

sion and Cancellation, par. 13; Henry v. Phillips, 105 Tex. 459, 151 S. W. 533; Pearson v. Kirkpatrick (Tex. Civ. App.) 225 S. W. 407; Williams v. Phelps (Tex. Civ. App.) 171 S. W. 1100; Lone Star Canal Co. v. Broussard (Tex. Civ. App.) 176 S. W. 649; Lee' v. Durham (Tex. Civ. App.) 156 S. W. 1135; Weeks v. Stevens (Tex. Civ. App.) 155 S. W. 667.

[9, 10] It is true that a vested title cannot, ordinarily, be lost by abandonment without full and satisfactory proof of an intention to abandon, but in the instant case no title vested, and none could vest until appellants were entitled to the lease. While no express agreement to abandon and rescind the original contract is shown, the facts are sufficient to sustain the court's finding that it had been abandoned. Time is of the essence of contracts of this character. According to the extension agreement, the standard rig should have been placed upon the premises within a reasonable time after March 9, 1919. This suit was not filed until May, 1921. Appellants may, in a measure, be excused for their failure to place a standard rig upon the premises during the efforts of the parties to organize a corporation and to procure Seigfried to explore the property. Under the contract with Seigfried it was his duty to begin operations by July 1, 1919. Upon his failure it unquestionably became the duty of appellants at once to proceed to carry out their contract, and no satisfactory explanation has been made of such failure.

A further fact tending strongly to show a mutual abandonment is the transaction whereby 2,000 acres of the very land in question was conveyed by the lessors to Seigfried. It is reasonably clear from the record that W. A. Miller, Jr., was the moving spirit in this transaction. He found Seigfried at Wichita Falls, brought him to Amarillo, and at a conference of all the parties called by him the lessors were induced to enter into a valid and binding contract with Seigfried for a part of the very land described in the original lease, and the appellants are now estopped to claim that said lease, which would give them the same acreage, a part of which they persuaded the lessors to convey to Seigfried, should be delivered to them. Priddy v. Green (Tex. Civ. App.) 220 S. W. 243, and authorities cited. The Seigfried contract in its terms is inconsistent with the original undertaking between the parties and the rule is that a contract is ordinarily abandoned by the execution of a subsequent contract inconsistent with the first. 3 Elliott on Contr. 10. 13 C. J. 603. Carman v. Harrah, 182 Mo. App. 365, 170 S. W. 388.

[11] Under the original contract the lessors would have been entitled to a royalty of one-eighth; the entire leasehold interest being vested in the appellants. Under the Seigfried contract· the lessors retained one half of the land included in the original lease, less 2,000 acres, and the appellants the other half of such remainder. The original agreement required that the drilling should be done with a standard rig. Under the Seigfried contract the land might be explored with a star rig. Appellants contracted to sell him the rig they had on· the premises. There are other material differences that render the obligations of the parties under the several contracts inconsistent and repugnant. The Seigfried contract, if not conclusive, is a persuasive fact showing abandonment, and it is no sufficient answer to this to say that Seigfried did not perform. A failure to perform the substituted contract does not revive the original one. 13 C. J. 596, 597. On June 26, 1919, W. A. Miller, Jr., wrote a letter from Wichita Falls to C. E. Deahl, as follows:

"I am just in receipt of your letter of the 24th, written in Amarillo, in regard to a release which it seems that Mr. Seigfried and Mr. Davidson, his attorney, wishes us to sign, and, replying thereto, I will say that I explained this matter to Stuart and also to Judge Gustavus. We have no claim on any portion of the land of course excepting the land which we are getting from you and your father under the Seigfried contract. The lease, which is in escrow in the First National Bank under our agreement, is canceled and held for naught under the agreement that we made with you and your father at the time you accepted the Seigfried contract. Mr. Hall, one of Mr. Seigfried's partners, has been here to see me, and explained to me the whole thing truthfully. Seigfried is not playing for a release, but for more time. Hall and others are refusing to put up the money; that is all that is the matter with Mr. Seigfried; there is nothing for us to sign whatever. We are to take the lease up for the 3,920 acres now in the hands of Judge Gustavus in escrow and return you the lease to the 9,920 acres, executed by you and your father March 4, 1918. I am sure that Judge Davidson understands this matter, and I am doubly sure that Mr. Seigfried understands it, and we are willing to sign anything to clear the matter up. The mistake was made when your father, against our wishes, accepted Seigfried's contract with a $200.00 forfeit. If you will remember, you and I both objected to it, but your father said he knew what he was doing, and that Seigfried would comply, and accepted it with only $200.00 as a guaranty, which I considered then, and do now, as nothing. I explained to Mr. Seigfried that we would cancel everything as soon as he complied with his contract. He understands this thoroughly. He has stalled us, and in every way in the world. We have instructed Mr. Hall to see Mr. Seigfried to-day on his return to Amarillo and try to get him to get busy and start the work. An affidavit by you to the effect that the former lease was not complied with is all that is necessary for Mr. Seigfried. We cannot release something which we do not possess, and Mr. Davidson is asking us to give a release to you or any one covering the lease in the First National Bank when there is a written agreement whereby that lease is canceled, having never been recorded. My father is very sick at Mar-

lin; we are expecting to bring him home within the next few days, and I perhaps will be in Amarillo the first part of next week and will take this up with you. I am exceedingly anxious to see something done. I have made every concession to you and to your father and to Mr. Seigfried in order to get this matter going, and I stand ready to-day to do anything consistent with good business to get the work started in the Antelope Peak Pasture, but I still insist that the little forfeiture which your father accepted with Seigfried looks like failure on Seigfried's part. I will call you up the very minute I get an opportunity from Amarillo. With kind personal regards, and hoping, that we may get some development started, I beg to remain," etc.

Miller, Jr., testified that the date of the contract as stated in his letter should have been March 9th instead of March 4th. It is difficult to see how the trial judge could have arrived at any other conclusion than that the contract was abandoned after reading the foregoing letter in the light of all the surrounding circumstances. W. A. Miller, Jr., testified:

"At the time when these negotiations were had with Seigfried, the Antelope Peak Oil Company was abandoned by all parties. There was no way for me to go on, and the Deahls would not go on unless they got some of this acreage back, and I then had to get the Seigfried proposition up and give them part of the acreage in order to get it drilled out."

The Deahls testified that on the night of May 15, 1919, after the parties had finished the Seigfried and Beard contracts, one of them spoke about remaining over in Amarillo until the next day to get the original lease and escrow agreement out of the bank, that W. A. Miller, Jr., stated that it made no difference, "as those papers were null and void and would do nobody any good or harm," and that he considered they were of no value to any one. This testimony is not denied. Miller, Jr., further testified:

"That lease contract with J. B. Beard was put up in escrow, and I presume it is still in escrow. I have asked for that to be delivered to me, the J. B. Beard contract that was put up in escrow, I think I made demand upon Deahls for that; I think I asked Ed Deahl for that, and perhaps wrote a letter in regard to it. That was soon thereafter, but I do not remember the dates. It was after the 1st of July I know."

It will be recalled that Seigfried bound himself to begin drilling about the 1st of July. The fact that W. A. Miller, Jr., demanded the delivery of the Beard contract, conveying 3,960 acres of the original leased premises to him, after the 1st of July, and when Seigfried had breached his contract by commencing to drill, is inconsistent with his contention that he considered the original contract still in force, and that his rights are in no way affected by the transaction which resulted in the Seigfried and Beard contracts.

We have not considered the propositions as presented in detail, but what we have hereinbefore said we think disposes of the main contentions presented.

The judgment is therefore affirmed.

## On Motion for Rehearing.

[12, 13] Appellants insist that this court cannot lawfully set aside the conclusion of the trial court that appellees had waived that term of the escrow contract requiring the use of a standard rig in developing the property because, they say, it is a fact found by the trial judge and supported by competent evidence. We think it is a conclusion of law rather than a finding of fact.

"Where the facts and circumstances relating to the subject are admitted, or clearly established, waiver becomes a question of law." 27 R. C. L. 912, § 7; 19 Ann. Cas. 879, note.

Courts of Civil Appeals are not bound in all cases by findings of fact of either the jury or the trial judge, and certainly not by the conclusions of law filed in the trial court, even where the appellee agrees that such findings are supported by the evidence, or such conclusions are correct.

It may be admitted that a well 4,000 feet in depth could have been drilled with a No. 28 star rig, and, further, that placing such rig upon the premises constituted substantial compliance with the contract, and yet the appellants would not be entitled to the possession of the lease. The installation of such a rig was not a strict compliance with the standard rig requirement. It is not contended that appellees affirmatively and directly waived that term of the contract which required appellants to place a standard rig upon the premises. It is clear from the record that none of the parties understood that it had been so waived. The written extension agreement which C. E. Deahl gave to McSpadden et al., and which we have construed as merely extending the time in which a standard rig should be installed, was dated January 25, 1919. Meade, who was appellants' head driller, testified:

"A derrick could have been constructed in connection with that operation out there while the drilling operations (with the star rig) were going on and being continued. Efforts were made and supplies were secured for the purpose of building a derrick out there. We had Mr. Burgess (a lumber dealer) to figure on furnishing the derrick. At that time he could not get timbers, and he did not have any timbers, but we got part of the timbers, that is the mudsills and the floor, and he figured on furnishing the derrick, and also said he would get the timbers. With the timbers that we did secure we built a floor around the machine and around the derrick; actually carried it out there and used it, and we were preparing to construct a derrick out there."

If it is true, as contended by appellants, that the star rig was a compliance, that appellees were willing for development to pro-

ceed with such a rig, and had waived the standard rig requirement, then why were appellants endeavoring to erect a derrick for the installation of a standard rig? This testimony is inconsistent with their position as to a waiver. W. A. Miller, Sr., in detailing the conversation and transaction at the time he, with Meade, called upon C. E. Deahl some time in the month of February, with reference to beginning operations with a star rig, testified:

"Mr. Meade told Mr. Deahl he knew of a certain outfit, and told him we would have the machine there to do the work before March 9th, which we did. Before March 9th we had a machine there that would use standard tools. We told him we would follow that up with a standard outfit and standard rig, and derrick before we got 2,000 feet. Meade told him we could easily go 2,000 feet, or more, with the star rig. I undertook to say it was specifically understood we were going 2,000 feet before beginning the derrick. We expected to begin the standard rig in a short time—as soon as it was necessary."

Certainly a finding of fact by the trial judge, in the face of this testimony, that the standard rig requirement had been waived, cannot be sustained. R. A. Webb, who was associated with the Millers at Wichita Falls, in operations down there, testified that Will A. Miller, Jr., was telling him about the Millers' leases in the Panhandle and especially the Deahl lease, and that Miller asked him to look out for a standard rig for him. This was between February 1st and 17th of 1918, and after the extension agreement had been given by Deahl to McSpadden et al. This witness stated that there was a freight embargo on at Wichita Falls. He stated that they finally located a star rig at Healdton, Okl., which was shipped to Miller & Sons at St. Francis. He further testified in this connection:

"After that star rig and standard tools were shipped from Healdton, Okl., to St. Francis we further pursued the quest of the standard rig or standard derrick. We proceeded then to get big timbers for a rig to arrange for the work. I went to see Mr. Stovall, who had a rig there out of Vernon and out of the territory where we could ship. I located that, and we had made arrangements to get that standard rig and ship it up here after we got spudded in with the other one. That was in the latter part of February, 1919. * * * We had made arrangements to get a standard rig with a bullwheel. I noticed a part of that rig there yesterday. They have never disposed of all of it yet. If you should go from here to Wichita Falls, you would notice it on the left-hand side of the railroad as you go down. * * * I advised Mr. Miller I had located a standard rig, but the rig was never shipped, because they never got the leases in shape so that the little company we made up at Wichita Falls never had any guaranty that we would get the (Deahl) lease in case we went to the expense and shipped the rig, and we didn't want to make an expense on a lease we didn't have. The Deahl and Miller lease is the one I refer to. If Miller got it, he was to give us an interest in it for drilling the well. * * * With reference to the derrick, I had located some heavy timbers down there. It seemed they had tried to get some heavy timbers down there from the lumber company up here, and had ordered some and were unable to get them. So I finally located some, and ordered three or four of the heavy timbers. I forget now where they were. I know who I ordered them from, but I was trying to locate where the heavy timbers were. I ordered them from Jack Stovall. * * * We contracted for the standard rig the latter part of February from Mr. Stovall. We had ordered it from Mr. Stovall, and we was ready to drill, but that was after—that was during the time that this rig was bought over at Healdton, to start the well. It would do to start a well, but in order to complete it at 3,500 feet, of course we figured on a larger rig, a standard rig, a big standard rig."

W. A. Miller, Jr., who it appears was the active manager of the firm of Miller & Sons, testified upon this point in part as follows:

"At the time we started this well (with the star rig) we intended to put a derrick there, and we built our floor and bought everything except the timbers for the legs. A derrick consists of four legs, and sometimes they are interlocked or doubled. We could not get those timbers at that time. Looking toward putting up a derrick at this place, we built the derrick floor and made proper excavations. I had made an agreement with Mr. Stovall, Mr. Webb, and Mr. Art, and others, in Wichita Falls, who owned a standard rig near Vernon, to get that rig complete, with all of their timbers and engine blocks, and so on, as soon as I could deliver them title or leases. * * * I had negotiated with Mr. Burgess here about ordering lumber for building a derrick. Mr. Burgess didn't have all the timbers; we could only get the flooring and 10x10's and sills for the derrick floor. That is all he had in stock, and we bought that much and built the derrick floor around the rig."

There is nothing in the testimony of either G. W. or C. E. Deahl inconsistent with that quoted above, and, whether the pronouncement of the trial judge to the effect that the standard rig had been waived is considered as a finding of fact or conclusion of law, we feel constrained to dissent from it. A careful reading of the entire record leads to the inevitable conclusion that none of the parties considered the Millers relieved from the duty imposed by the standard rig requirement of the contract up to March 16th, when by agreement of all the parties efforts were made in several different directions to have the premises drilled by other parties. It is clear from the entire record that the Millers were not able, without some such arrangement, and through the help of outside parties, to develop the property in accordance with the requirements of the contract. To this end they first agreed with McSpadden, Blackshear, and others, giving them a sublease. When this lease was forfeited, about

the 1st of February, the matter was taken up with Webb, Stovall, Art, and their associates at Wichita Falls. They declined to furnish and install the standard rig until the Millers had acquired the lease. Then it was proposed to organize a corporation, and, in connection with Carson county parties, acquire more acreage, and with the proceeds to be derived from the sale of stock the standard rig could be installed. Because of the inability of Rorex and the other Carson county parties to obtain additional acreage in that locality, the scheme to incorporate was abandoned, and it was proposed to organize a joint-stock company, with the same powers which originally were intended to be vested in the corporation. This scheme also failed, and immediately Will A. Miller, Jr., appeared upon the scene with Seigfried, and with whom a contract was made, as set out in the original opinion. During all of these negotiations by common consent the actual work of drilling was suspended.

The above-mentioned negotiations were instigated by, and were for the benefit of, the Millers, and it would be inequitable to hold that the acquiescence of the appellees in such negotiations, or even their active support of any or all of the schemes, should be construed as a waiver of the escrow contract, either as a matter of fact or law. We think it should rather be construed as an effort to enable the Millers to comply with the contract through other parties, and to protect them in their rights if possible under the original lease. Nothing is clearer than that the Millers and those associated with them, Meade and Webb, understood, at least until March 16th, that a standard rig would have to be eventually erected upon the premises. As said in the original opinion, there is no evidence of an express waiver. The above-quoted testimony shows no intent on the part of any one to waive, but, on the contrary, clearly shows that the Millers and those connected with them understood that it had not been waived. We have searched the record in vain to discover any act of the Deahls, or either of them, which amounts to an estoppel, and the record is barren of any consideration moving to them which would support an agreement to waive. The appellants insist that, since there was no attack made upon the court's finding and no cross-assignment by the appellees, but rather an admission by appellees that the finding is supported by testimony, this court has no right to review this phase of the case; the authorities hold otherwise. The court's conclusions of law, based upon his findings of fact, are in effect the judgment of the court; and, where the facts are practically undisputed upon any issue, as we find them here, to hold that this court cannot review and reverse the trial judge upon said conclusions is in effect a holding that appellate courts cannot reverse the judgments of lower courts. It has been frequently held that an erroneous conclusion of law, based upon undisputed facts, presents fundamental error in the appellate court. Carroll v. Evansville Brewing Association (Tex. Civ. App.) 179 S. W. 1099; Bexar Building Association v. Newman (Tex. Civ. App.) 25 S. W. 461. The effect of the Supreme Court's holding in Walker v. Haley, 110 Tex. 50, 214 S. W. 295, is that the trial judge's conclusion of law upon undisputed facts presents fundamental error, where such conclusion is put into effect by directing a verdict. Norvell-Shapleigh Hdwe. Co. v. Lumpkin (Tex. Civ. App.) 150 S. W. 1194.

We have not held that the failure of the Millers to pay the rental provided for in the original lease was a forfeiture. The transaction has not reached the state where a forfeiture could be declared. We do hold, however, that their failure to pay or tender the rentals is a persuasive fact, tending strongly to show that they understood they were not entitled to possession of the lease, and that no rights thereunder had vested in them.

The motion for rehearing is overruled.